**HAROLD FRIEDMAN, INC., Appellant,**

v.

**KROGER COMPANY.**

No. 77–2223.

United States Court of Appeals,
Third Circuit.

Argued May 2, 1978.
Decided June 26, 1978.

---

Clayton A. Sweeney, Bruce A. Americus, of Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for appellant.

Roger C. Wiegand, of Reed Smith Shaw & McClay, Pittsburgh, Pa., for appellee.

Before SEITZ, Chief Judge, and VAN DUSEN and ROSENN, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

This is an appeal from an order granting defendant's motion for summary judgment in a case brought under §§ 1 and 2 of the Sherman Act. We affirm.

### I.

The record establishes the following facts. The plaintiff, Harold Friedman, Inc. (hereinafter Friedman), is a franchisee of Foodland, Inc., a national grocery store chain. Prior to the actions complained of, Friedman operated four Foodland grocery stores in the Butler, Pa., area. At the time the complaint was filed and at the time the motion for summary judgment was granted, Friedman operated five such stores. Defendant, the Kroger Company (hereinafter Kroger), is the nation's third largest supermarket chain, operating over 1,200 stores in 20 states. During all relevant times, Kroger operated one store in the Butler area. On March 27, 1959, defendant Kroger leased a store in the Greater Butler Mart shopping center. The lease entitled Kroger to the premises until October 31, 1976, with an option to renew until October 31, 1991, and contained a restrictive covenant preventing the landlord from leasing other space in the shopping center to more than one other grocery store. On September 22, 1972, Kroger decided to abandon this store and to erect a much larger "Superstore" within two miles of the shopping center and nearer to the center of Butler. Having learned of Kroger's decision to terminate its shopping center operation from one of the owners of the shopping center, Friedman expressed to the landlord an interest in leasing Kroger's space. The landlord informed Kroger of this, and on May 23, 1973, Kroger notified the landlord that it would abandon the space in November 1973 upon the opening of the new store, and also advised the landlord that it would attempt to find a suitable sub-tenant. Kroger's attempts to find a sub-tenant were unsuccessful, much to the concern of the landlord, because of the adverse effect on the other tenants of having a significant portion of the shopping center vacant.

During this time, Friedman and the shopping center landlord began negotiating a lease agreement for the premises and in November 1973 entered into an agreement in principle for lease of the premises. In December 1973, the landlord informed Kroger that it had found a tenant and asked Kroger to agree to termination of the lease. On December 8, 1973, Kroger closed the shopping center store and opened its new store, but retained the shopping center premises despite the knowledge that the landlord had found a tenant. Friedman did not approach Kroger about subletting the premises and Kroger continued to seek a sub-tenant to no avail.

On January 17, 1974, Friedman and the landlord executed a lease of the premises, contingent upon the landlord's terminating Kroger's lease. Two weeks earlier, however, on January 4, 1974, Kroger had contracted with Harry Davis and Company, auctioneers, to auction Kroger's equipment at the closed shopping center store. The contract provided that the equipment was to be removed by the buyer at the buyer's risk and expense within a time specified by the auctioneer. This removal provision was standard for all prior auctions conducted by Davis for both Kroger and Friedman. On

February 4, 1974, Friedman purchased the equipment at the auction with the intention of leaving it in place and opening a Foodland store on the premises. Friedman claims that he informed Davis of this intention, but in his deposition Davis states that he recalls no such conversation. On February 20, Davis reminded Friedman that the terms of the sale required him to remove the equipment, and on March 22 Kroger informed Friedman by certified mail that if Friedman did not remove the equipment by April 2, 1974, Kroger would have it moved and stored for Friedman's account. Friedman claims that he offered to pay Kroger an amount equivalent to three months' rent on the premises if Kroger would allow Friedman to leave the equipment in place and that Kroger refused.

In mid-April Kroger hired the Henry T. Limberg Company to remove the equipment. This removal was completed by April 19. Friedman alleges that the removal was done in such a way as to necessitate very lengthy and excessive repairs. For example, Friedman testified that pipes and copper tubing which Friedman had purchased were ripped out of the floor, causing extensive damage.

Meanwhile, the shopping center landlord sued Kroger to terminate the lease, claiming that Kroger had defaulted by allowing the premises to remain vacant. This litigation was settled on May 7, 1974, when Kroger agreed to terminate the lease. Friedman took over the premises at that time.

On August 30, 1974, Kroger notified Friedman that the removed equipment was being stored and that unless Friedman contacted Kroger immediately and reimbursed it for moving and storage costs, Kroger would resell the equipment to recover those costs. Friedman's attorney responded that the moving and storage costs were incurred by Kroger's unilateral action and that any sale was without Friedman's consent. On October 29, 1974, the equipment was auctioned by Harry Davis and Company for an amount which was less than the cost of moving and storage. In November 1974, Friedman opened a Foodland store at the shopping center with new equipment.

On June 19, 1975, Friedman filed the present action, alleging that Kroger's conduct damaged Friedman by delaying the opening of the Foodland store at the shopping center, by causing Friedman to purchase and install new equipment to replace the equipment removed and sold by Kroger's agents, and by causing Friedman to repair the damage done when the equipment was removed from the premises. The complaint alleges that Kroger's actions constitute violations of §§ 1 and 2 of the Sherman Act, as well as various wrongs actionable under Pennsylvania law, including interference with competition, conversion of property, interference with business relationship, and breach of contract. The district court granted defendant's motion for partial summary judgment with respect to the counts of the complaint alleging violations of the Sherman Act. At the request of both parties, the district court expressly directed that the order granting such motion should be a final judgment in accordance with the terms of F.R.Civ.P. 54(b), thereby permitting an immediate appeal of such order.

## II.

We recognize that summary judgment should be used sparingly in antitrust cases, *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1961), but also understand that the Sherman Act does not purport to afford remedies for all business torts committed by or against persons engaged in interstate commerce. *Hunt v. Crumboch*, 325 U.S. 821, 826, 65 S.Ct. 1545, 89 L.Ed. 1954 (1945).

## A. THE SECTION 1 CLAIM

Section 1 of the Sherman Act provides in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal

. . . ." 15 U.S.C. § 1.[1] The district court ruled that the defendant was entitled to summary judgment because its conduct did not unreasonably restrain trade.[2] We requested briefing on the issue of whether Kroger's activities constituted concerted activities as required by § 1. We hold that the requirement of concerted activity was not met and therefore find it unnecessary to reach the restraint of trade issue.

■ Section 1 of the Sherman Act does not proscribe every act that restrains trade. Rather, by its express language, it requires a "contract, combination . . . or conspiracy in restraint of trade." In short, it requires concerted activity.[3] Of course, the classic case of concerted action is an agreement by competitors to engage in a common course of conduct. L. Sullivan, Antitrust 312–13 (1977). The Supreme Court, however, has made clear that the Sherman Act's concept of concerted activity extends beyond the classic case.[4] Just how far it extends beyond the classic case is the issue here. For reasons given in the discussion that follows, we conclude that the record here does not present a case of concerted activity.

Plaintiff relies on *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). In finding concerted activity in *Albrecht*, the Supreme Court adopted an expansive interpretation of "contract, combination . . . or conspiracy." Since *Albrecht* is the Supreme Court's most recent definitive discussion of this topic, our analysis must begin there. Although *Albrecht* bears a superficial similarity to the present case, our analysis will show that that case is distinguishable.

*Albrecht* concerned a newspaper publisher's attempt to force distributors to adhere to a retail price set by the publisher. Plaintiff Albrecht was the exclusive distributor in a particular area of metropolitan St. Louis of the newspaper published by the defendant, Herald Company. When Albrecht raised his price above the Herald's suggested resale price, the Herald informed him that if he did not lower his price, the Herald would take over Albrecht's route and deliver the papers. The Herald hired Milne Circulation Sales, Inc. to solicit subscriptions from Albrecht's customers at the Herald's lower price. Then the Herald entered into an agreement with George Kroner to have Kroner deliver the papers to the customers Milne had lured away from Albrecht. Kroner knew that the Herald would not tolerate his charging more than the Herald's suggested retail price and also understood that he might have to relinquish the route if Albrecht acceded to the Herald's demand that he reduce his price to the suggested retail price.

Albrecht claimed that the Herald's agreements with Milne and Kroner constituted concerted activity under § 1, and the Supreme Court agreed with this contention. The Court stated:

"[T]here can be no doubt that a combination arose between respondent, Milne,

---

**1.** 15 U.S.C. § 15 provides:

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

**2.** For a discussion of the decisional law in this circuit and in the Supreme Court on the requirement that the restraint be unreasonable, see, e. g., *Columbia Metal Culvert Co. v. Kaiser Aluminum & Chemical Corp.*, 579 F.2d 20 at 32, at n.45 (3d Cir. 1978).

**3.** As Professor Sullivan has noted:

"[I]t presents a single concept about common action, not three separate ones: 'contract * * * combination or conspiracy' becomes an alliterative compound noun roughly translated to mean 'concerted action.' There is little need to grapple with issues about the meanings of the particular words of the statute nor to mark nice distinctions among them."
L. Sullivan, Antitrust 312 (1977).

**4.** *See, e. g., Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *United States v. Bausch & Lomb Co.*, 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944).

and Kroner to force petitioner to conform to the advertised retail price. When respondent learned that petitioner was overcharging, it hired Milne to solicit customers away from petitioner in order to get petitioner to reduce his price. It was through the efforts of Milne, as well as because of respondent's letter to petitioner's customers, that about 300 customers were obtained for Kroner. Milne's purpose was undoubtedly to earn its fee, but it was aware that the aim of the solicitation campaign was to force petitioner to lower his price. Kroner knew that respondent was giving him the customer list as part of a program to get petitioner to conform to the advertised price, and he knew that he might have to return the customers if petitioner ultimately complied with respondent's demands. He undertook to deliver papers at the suggested price and materially aided in the accomplishment of respondent's plan."

*Id.* at 149–50, 88 S.Ct. at 872.[5]

The Supreme Court made no attempt to articulate a test or standard for concerted activity in *Albrecht*, but certain factors which appear to be crucial can be gleaned from the case. First, both Milne and Kroner knew that the Herald's purpose was to assure its fixed price for the retail sale of the papers. Therefore, knowledge of the defendant's purpose to restrain trade is an important factor. Secondly, at least two members of the combination stood to benefit by the restraint of trade, the Herald by assuring the price it desired and Kroner by getting a profitable paper route.[6] Thus, in a sense, two members of the combination shared a common purpose insofar as they both benefited from the restraint of trade.[7]

A final important factor in *Albrecht* is that the agreement with Kroner was in no sense collateral to the purpose to restrain trade but went to the heart of the restraint. This can be seen by comparing Kroner's role with Milne's. By soliciting customers, Milne was merely performing its normal business function, and although that function facilitated the restraint of trade, it did not restrain trade. Kroner's agreement to sell at a fixed price, by contrast, did restrain trade. It precluded sales in the area of his distributorship at a higher price. Furthermore, Kroner's agreement went beyond a lawful agreement to perform the normal business function as a distributor, as it included an agreement to sell at a fixed price. As a corollary to this, it is clear that Kroner, in contrast to Milne, intended to restrain trade. To summarize, the following factors were present in *Albrecht*: (1) all members of the combination knew of the defendant's purpose to restrain trade; (2) at least two members of the combination benefited by the restraint of trade and, in that sense, shared a common purpose in restraining trade; (3) the agreement by two members of the combination actually restrained trade, as opposed to merely facilitating the restraint; and (4) at least two members of the combination intended to restrain trade.

We have these comments on the significance of these four factors. First, factors 2 and 3 apply only to Kroner, and it is not clear from the *Albrecht* opinion whether the Supreme Court would have found concerted activity under § 1 based on the agreement between the Herald and Milne alone if the Herald had delivered the newspapers itself and not hired Kroner. It would have been reasonable for the Court

---

5. Justice Harlan dissented on the ground that Milne and Kroner were just being paid to do jobs the Herald could have done and, therefore, the Herald's "activity was in its essence unilateral." *Id.* at 161, 88 S.Ct. at 877. (Harlan, J., dissenting).

6. Kroner could only get the paper route by agreeing to the restraint of trade, the fixed price. Although this was a necessary condition of his retaining the route, it was not a sufficient

condition because Albrecht may have been able to get the route back by reducing his price. Nonetheless, as long as Albrecht remained adamant, Kroner profited by the restraint of trade.

7. Milne, by contrast, did not share this common purpose. Its only purpose was to earn its solicitation fee and it had no interest in whether the Herald was successful in fixing the retail price.

to have found that the Herald acted unilaterally in such a case, for in this hypothetical case only the Herald intended to restrain trade, only the Herald restrained trade, only the Herald stood to benefit from restraining trade, and no one shared with the Herald a common purpose of restraining trade. Professor Areeda also finds this position reasonable and suggests that a purely collateral agreement, such as that between Milne and the Herald, is insufficient to constitute concerted activity. Areeda makes this point by asking the following question, which poses the extreme case: "Does the Court imply that any defendant who, say, uses the telephone has 'combined' with the telephone company?" P. Areeda, Antitrust Analysis 567 (1974). Clearly, a defendant whose acts in restraint of trade are facilitated by its use of the telephone has not combined with the telephone company by virtue of its contract for telephone services. It seems to us, therefore, that Kroner's role in the combination was crucial to the outcome of the case.

Our second observation is closely related to the first. Of the four factors, the only one the Supreme Court emphasized was the first. Therefore, for there to be concerted activity under *Albrecht*, the party combining with the defendant must have knowledge of the defendant's anticompetitive purpose. Since the Court did not emphasize the other three factors, we cannot say that they constitute part of the Supreme Court's test for concerted activity. Indeed, the Supreme Court approach in *Albrecht* seems to be *ad hoc* rather than an attempt to formulate a test. Therefore, since the second and fourth factors are present in *Albrecht*, finding concerted activity in a case in which one or more of these factors is absent would be an expansion of *Albrecht* beyond its narrow factual confines. Such an expansion, of course, would have to be justified on grounds independent of *Albrecht*. Because we have found Kroner's role to be crucial in *Albrecht*, such justification is unlikely if all three of factors 2 through 4 are absent.

We now turn to the task of applying the principles of *Albrecht* to the facts of this case. Plaintiff contends that there are three possible grounds on which concerted action can be found: the lease agreement between the shopping center landlord and Kroger and the landlord's refusal to breach the lease; the agreement between Kroger and the auctioneer, Davis; and Kroger's contract with Limberg for removal of the equipment.[8]

In applying the four factors present in the *Albrecht* case to these facts, it is evident that factors 2 and 3 are not present here. Factor 2 was that at least two members of the combination benefited by the restraint of trade and shared a common purpose in restraining trade. In the present case, only Kroger would benefit from preventing Friedman from operating a grocery store at the shopping center. Davis, Limberg and the shopping center landlord would receive no benefit from keeping Friedman out and, therefore, did not share a common purpose with Kroger. Factor 3 in *Albrecht*, that an agreement between the defendant and at least one other party to the combination actually restrain trade, as opposed to merely facilitating the restraint of trade, is also absent here. For an agreement actually to restrain trade in this case, as did the agreement between Kroner and the Herald in *Albrecht*, someone would have had to agree to sublease the premises from Kroger, agree not to operate a grocery store from the premises, and agree not to sub-let the premises to any other party for the purpose of operating a grocery store. Thus, the agreements plaintiff characterizes as constituting concerted activity in this case are collateral to the restraint of trade.

This case, then, is distinguishable from *Albrecht* in two important respects, but that does not end our inquiry, for we need to determine if the principles of *Albrecht* should be extended to this case. Therefore,

8. Neither plaintiff's complaint nor its arguments on appeal contend that there was concerted activity between Kroger and auctioneer Davis when the equipment which had been removed from the shopping center premises was auctioned the second time.

to determine to what extent this case is distinguishable from *Albrecht*, we must determine whether factor 1, knowledge of defendant's purpose, and factor 4, intent to restrain trade, are present in this case.

### The agreement between Kroger and the shopping center landlord

Since the lease agreement between Kroger and the landlord occurred in 1959, 13 years before Kroger decided to leave the shopping center premises, the lease itself could not possibly have constituted concerted activity in restraint of trade. Therefore, Friedman argues that the landlord, by not renting to Friedman property in which Kroger had a leasehold interest, acted in concert with Kroger. Friedman argues that the landlord's failure to do this makes the landlord an unwilling co-conspirator.

■ Conceding that the landlord knew of Kroger's purpose to restrain trade, we nonetheless hold that the landlord's action, or inaction, did not constitute concerted activity with Kroger. Short of subjecting itself to liability for leasing property which it had no right to possess, the landlord did everything it could to resist Kroger's attempt to prevent Friedman from leasing the property. The landlord opposed Kroger, first, by demanding that Kroger relinquish the premises and, subsequently, by resorting to litigation. Ultimately, the landlord was successful by obtaining a settlement agreement in which Kroger agreed to terminate the lease. To characterize this as unwilling cooperation distorts the record. Appellant's Letter Brief of April 21, 1978, at 4. This is not a case in which a party to a conspiracy unwillingly went along with the defendant, but a case in which the party successively resisted the attempts of the defendant to force it to go along. The fact that success in resisting Kroger did not occur overnight does not convert the landlord's attempt to resist Kroger into concerted activity. The evil of coercing a weak party to aid a strong party in restraining trade simply is not present here. Regarding factor 4, then, the landlord did not intend to restrain trade. And the landlord's

knowledge of Kroger's anti-competitive purpose (factor 1) is not enough to make the landlord's protracted attempt to resist Kroger concerted activity. To hold otherwise would constitute a distortion of the words "contract, combination . . . or conspiracy."

### The agreement between Kroger and auctioneer Davis

The contract between Kroger and the auctioneer contained a standard provision requiring the purchaser to remove from the store all items purchased. There is no evidence that Davis knew of Kroger's anti-competitive purpose or intent to restrain trade at the time Davis entered into the contract with Kroger and thereby agreed to this provision. Thus, plaintiff argues that Davis acted in concert with Kroger by forcing Friedman to comply with this condition of the auction.

A perusal of the record discloses that Davis' role in enforcing this provision was *de minimis*. Davis' role was limited solely to writing a letter to Friedman which stated:

> "Our contract with Kroger requires that the premises be cleared by the purchasers. These were the terms under which you made your purchase.
>
> "Please notify us as soon as possible as to your intentions so that we may schedule our personnel to be in attendance to monitor the removal of your purchases."

67a.

Thus, Davis simply informed Friedman of the conditions of sale, but made no attempt to force Friedman to abide by those terms. Subsequently, Kroger notified Friedman that it, Kroger, intended to enforce the removal provision. When Friedman refused to remove the equipment, Kroger, not Davis, contracted with Limberg to have it removed.

■ Even if we were to assume that after the auction contract had been entered into Davis learned of Kroger's intent to restrain trade and that Davis intended to

restrain trade,[9] Davis' actions fall short of the standards of *Albrecht.* As plaintiff admits, in *Albrecht* the parties to the combination " '. . . *materially* aided in the accomplishment of respondent's plan.' " Appellant's Letter Brief of April 21, 1978, at 1, quoting *Albrecht* at 150, 88 S.Ct. at 872 (emphasis supplied). The letter written by Davis did not *materially* aid Kroger. Not only was it not necessary to the accomplishment of Kroger's purpose, it was not even particularly helpful. Therefore, under *Albrecht* there was no concerted activity in restraint of trade between Kroger and Davis.

### The agreement between Kroger and Limberg

Limberg's action in removing the equipment from the premises did materially aid Kroger in accomplishing its purpose. Thus, we need to determine whether the affidavits, depositions, and uncontradicted allegations in the pleadings raise a genuine issue of material fact as to whether Limberg knew of Kroger's anti-competitive purpose or intended to restrain trade.

■ Although the complaint does not specifically allege that Limberg knew of Kroger's anti-competitive purpose, it does allege that the contract for removal constituted a combination in restraint of trade. The only evidence plaintiff introduced to show that Limberg had knowledge of Kroger's purposes and intended to restrain trade was the deposition of Friedman himself. Friedman testified that the equipment was removed in such a way as to cause damage to the premises, requiring expensive repairs.[10] Plaintiff argues that this fact raises the inference that Limberg had the requisite knowledge and intent. Of course, this inference requires the intermediate inference that the damage was inflicted intentionally at Kroger's request. Taking the fact of the damage as established, we do not think it is sufficient to raise the inference that Limberg knew of Kroger's purpose to restrain trade or that Limberg intended to restrain trade.

9. The only evidence that Davis knew of Kroger's intent to restrain trade is the claim made in Friedman's deposition that he told Davis at the time of the auction that he, Friedman, had leased the premises and wished to leave the equipment in place. 141–42a. When Kroger then told Davis that it wanted the equipment moved, it might be possible to infer that Davis then learned that Kroger intended to restrain trade. However, Davis stated in his deposition that he did not recall Friedman's telling him that he had leased the premises and wished to leave the equipment in place. Deposition of Harry Davis at 27. Furthermore, at the time of the auction, Friedman had not technically leased the premises because the lease was contingent upon the termination of Kroger's lease. Kroger's lease was not terminated until three months after the auction.

10. Friedman's deposition is repetitious and ambiguous, but the following allegations can be summarized from it:

(1) The floor was damaged when Limberg removed copper tubing from trenches in the floor. 159a. The copper tubing was sold separately at the auction.

(2) A wall was damaged when a cooler was removed from it. 160a.

(3) Valances and lighting fixtures were "torn out" and left in a corner. 161, 166, 174a.

(4) A serious leak in the roof was created when an air conditioner compressor was removed. 162a.

(5) Part of a wall was removed where a cooler had been attached. 170, 181a.

(6) Pipes and electrical wiring were disconnected from equipment in such a way as to require repairs. 171a.

Friedman also testified that he had no knowledge of whether Kroger instructed Limberg to cause this damage. Deposition of Harold Friedman at 87.

The deposition of Ralph George Mehringer, who was the manager of facility engineering for Kroger and was responsible for hiring Limberg to remove the equipment, also provides evidence concerning the damage. Regarding item (4) above, Mehringer stated:

"[D]uring the course of the removal Mr. Limberg mentioned that the building roof was leaking. There was a very severe roof leak along the rear of the building which I passed on to Mr. Kittelson [Kroger's real estate manager] and asked him to pass that on to the lessor."

Deposition of Mehringer at 119. Regarding item (5) above, Mehringer stated:

"We removed, for example, the coolers. They were built into the partitions. We removed them the best we could not to damage any partitions."

*Id.* at 103.

Significantly, this inference, or, more accurately, this inference upon inference, is directly contradicted by evidence in the record. Relying on circumstantial evidence to show knowledge and intent, plaintiff did not depose Henry T. Limberg, Jr., the president of Limberg Company, or any of his employees. Yet Limberg's sworn affidavit states the following:

"3. No one at Kroger directly or indirectly ordered me or advised me or anyone at my Company to remove this equipment from the premises in a careless or destructive manner. . . . In fact, Friedman's Foodland subsequently hired me to install its newly purchased equipment and to perform certain renovations to the premises which were not caused by or required by my removal of the Kroger equipment. In addition, Mr. Friedman has used the services of my Company since I installed his new equipment for him at this location.

"4. At no time did anyone from The Kroger Company directly or indirectly tell me or anyone under my control that the purpose of my removal of the Kroger used equipment was to hinder or delay the opening by Harold Friedman of a Foodland store on this location."

Affidavit of Henry T. Limberg (Jr.), docket entry 60.

This is corroborated by the deposition of Ralph George Mehringer, who, as Kroger's Manager of facility engineering, was responsible for hiring Limberg to remove the equipment. As the following excerpt from his deposition demonstrates, Mehringer testified that he did not instruct Limberg to remove the equipment in a destructive manner:

"Q. Did you give them [Limberg] any special instructions concerning the manner in which the removal was to be done?
"A. Yes. I believe I directed them to avoid any damage to the equipment; that it was to be removed in such a fashion that it could be re-used again.
"Q. Was that your only special instruction to them?
"A. Yes. I don't recall anything else.

"Q. You don't know who you dealt with at the Henry T. Limberg Company.
"A. Yes, Hank Limberg, Jr. [Henry T. Limberg, Jr.]"

Deposition of Mehringer at 95.

"Q. You gave them the authority to move forward and remove it however they saw fit, didn't you?
"A. I don't agree with that.
"Q. Did you tell them they didn't have specific authority to remove any of the equipment?
"A. I did not tell them you have authority to remove the equipment any way you see fit.
"Q. Did you tell them they had the authority to remove the equipment?
"A. No. I told them that I wanted them to remove the equipment and that I was issuing the purchase order for them to do it and that I wanted the equipment removed in such a fashion so that it would not be damaged and so that it could be re-used.
"Q. You left to them the manner in which this would be done; is that correct?
"A. From that point forward it was their responsibility."

*Id.* at 125–26.

Furthermore, Mehringer testified that it was not unusual for employees of removal contractors to inflict the type of damage found here of their own accord.

"I find that in certain occasions the people that are doing the removal, they have no interest in that building. They are strictly outside contractors. They have occasionally damaged a building. They don't seek to take the time to disconnect something. They know the electrical conduit is dead because they have killed the breaker in the back. They just whack it off."

*Id.* at 73.

Recognizing that on a motion for summary judgment we must view the record in the light most favorable to the party opposing the motion, *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), we find that the record does not

support the inference that Limberg had the requisite knowledge or intent. Therefore, none of the four factors we have identified in the *Albrecht* combination are present in the agreement between Kroger and Limberg, and this agreement cannot support plaintiff's claim of concerted activity.

As we stated earlier, despite a superficial similarity between *Albrecht* and the present case, our analysis shows that the cases are distinguishable in crucial respects. Furthermore, we think our decision not to extend the *Albrecht* result to the facts here finds support independent of our analysis of *Albrecht*.

This court and at least one other circuit court of appeals have declined the opportunity to extend *Albrecht* to agreements facilitating a restraint of trade when a party has simply entered into a permissible contract with the defendant or when the defendant has enforced a contractual right with another party.[11] In *Williams v. Independent News Co., Inc.*, 485 F.2d 1099 (3d Cir. 1973), plaintiff Williams bought and sold surplus comic books. The comic books were published by defendant Independent and distributed through defendant Magazine Management (Magazine), the exclusive authorized distributor. Magazine had been selling its surplus to one Waldman, who in turn sold some of these comic books to Williams. Independent complained to Magazine that the comic books sold by Williams were being sold on the retail market at prices lower than those distributed to retailers through Magazine, thus hurting the profits of both Independent and Magazine. Magazine then ceased selling to Waldman, thereby cutting off Williams' supply. Williams sued, claiming that the agreement between Independent and Magazine to cut off Waldman constituted concerted activity under § 1 of the Sherman Act. This court rejected that claim and held that, even if Independent directed Magazine to termi-

nate sales to Waldman, Independent was rightfully enforcing its exclusive dealing contract. *Id.* at 1105.

More recently, in *Columbia Metal Culvert Co. v. Kaiser Aluminum & Chemical Corp.*, 579 F.2d 20 (3d Cir. 1978), this court affirmed a directed verdict in favor of a co-defendant in an antitrust case because "there was insufficient evidence from which the jury could find a 'unity of purpose, design or understanding,' between [that defendant] and the other defendants . . . ." *Id.* slip op. at 26, at 36.[12]

*Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc.*, 531 F.2d 910 (8th Cir. 1976), also lends support to our decision. Defendant Morton manufactured prefabricated buildings and plaintiff, Morton of Nebraska (referred to as "West" after the name of its owner), was a Morton dealership selling and erecting the buildings in Nebraska. Morton decided to take over West's operation and to sell and erect the buildings in Nebraska. In doing so, Morton hired some of West's employees. West contended that the employment contracts between Morton and West's former employees constituted concerted action under § 1 of the Sherman Act. The court rejected this contention in dicta, stating:

> "It is necessary to prove the existence of at least an implied agreement as a prerequisite to establishing a conspiracy. The Supreme Court of the United States has liberalized the proof requirements in this regard by permitting the finding of an implicit conspiratorial agreement between parties, some of whom have marginal involvement in or awareness of the overall scheme. *Albrecht v. Herald Co.*, 390 U.S. 145, 150 & n. 6, 88 S.Ct. 869, 871, 19 L.Ed.2d 998, 1002 (1968); *United States v. Parke, Davis & Co.*, 362 U.S. 29, 45–47, 80 S.Ct. 503, 512–513, 4 L.Ed.2d 505, 515–517 (1960). We note in the present case that West's employees did

---

11. Plaintiff does not cite, nor does our research disclose, any appellate decision extending *Albrecht* to a case in which the agreements supporting a claim of concerted activity are similar to those here.

12. *See also* Handler, Through the Antitrust Looking Glass—Twenty-First Annual Antitrust Review, 57 Calif.L.Rev. 182, 190 (1969), which suggests that a common purpose is necessary for concerted activity.

nothing more than accept a permissible offer of employment from Morton."

*Id.* at 917 n. 9.

Finally, we think Justice Harlan's dissenting opinion in *Albrecht* offers good reasons for a court to exercise caution when asked to extend *Albrecht* to a case in which none of the parties allegedly acting in concert with the defendant have an interest in restraining trade and all such parties enter into agreements which do not themselves restrain trade but are collateral to the restraint of trade. Justice Harlan stated:

"If the critical question is whether a company pays one of its own employees to perform a routine task, or hires an outsider to do the same thing, the requirement of a 'combination' in restraint of trade has lost all significant meaning. The point is more than that the words in a statute ought to be taken to mean something of substance. The premise of § 1 adjudication has always been that it is quite proper for a firm to set its own prices and determine its own territories, but that it may not do so in conjunction with another firm with which, in combination, it can generate market power that neither would otherwise have. A firm is not 'combining' to fix its own prices or territory simply because it hires outside accountants, market analysts, advertisers by telephone or otherwise, or delivery boys."

*Albrecht* 390 U.S. at 160–61, 88 S.Ct. at 877 (Harlan, J., dissenting).[13]

13. *See also* The Supreme Court, 1967 Term, 82 Harv.L.Rev. 95, 257–58 (1968), suggesting additional reasons why *Albrecht* should be interpreted narrowly.

14. This test is derived from Justice Holmes' opinion in *Swift & Co. v. United States*, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905). Justice Holmes stated:

"Where acts are not sufficient in themselves to produce a result which the law seeks to prevent—for instance, the monopoly,—but require further acts in addition to the mere forces of nature to bring that result to pass, an intent to bring it to pass is necessary in order to produce a dangerous probability that it will happen. *Commonwealth v. Peaslee*, 177 Massachusetts, 267, 272, 59 N.E. 55. But

For the foregoing reasons, we hold that the defendant is entitled to summary judgment on the § 1 claim on the ground that the record does not support the allegation of concerted activity.

**B. THE SECTION 2 CLAIM**

Section 2 of the Sherman Act provides in relevant part:

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, . . shall be deemed guilty of a felony, . . ."

The district court held that plaintiff's evidence could support neither its claim of monopolization nor its claim of attempt to monopolize. On appeal, plaintiff has abandoned its claim of monopolization; therefore, we need only decide whether the district court was correct in granting defendant's motion for summary judgment on the claim of attempted monopoly.

■ The two essential elements of a § 2 attempt to monopolize violation are a specific intent to monopolize the relevant market and sufficient market power to come dangerously close to success. *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1348 (3d Cir. 1975).[14] Neither element is present in this case.

■ We agree with the district court that the record establishes that the Butler area retail grocery market is the relevant

when that intent and the consequent dangerous probability exist, this statute, like many others and like the common law in some cases, directs itself against that dangerous probability as well as against the completed result."
*Id.* at 396, 25 S.Ct. at 279. For other cases applying this test, *see, e. g., American Tobacco Co. v. United States*, 328 U.S. 781, 785, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); *Yoder Bros., Inc. v. California-Florida Plant Corp.*, 537 F.2d 1347, 1368 (5th Cir. 1976); *Morning Pioneer, Inc. v. Bismarck Tribune Co.*, 493 F.2d 383, 386 (8th Cir. 1974). *See also* 3 P. Areeda & D. Turner, Antitrust Law 335–36 (1978); L. Sullivan, Antitrust at 134 (1977).

market, and plaintiff seems to concede this on appeal. Brief for Appellant at 24. There is no evidence in the record that Kroger intended to monopolize the retail grocery market in the Butler area or to eliminate Friedman from the Butler area. Viewing the record in the light most favorable to the plaintiff, we conclude that it establishes that Kroger intended no more than to prevent Friedman from operating a store at Kroger's former location in the shopping center. There is nothing in the record that even suggests by way of inference that Kroger intended to harm Friedman's operations in any of its other Butler area stores or harm its operations in Butler generally.

Uncontradicted evidence in the record also establishes that Kroger did not have sufficient market power to come dangerously close to successful monopolization. When Kroger closed its shopping center store on December 8, 1973, the market shares were as follows:

| | |
|---|---|
| Foodland (Friedman) | 28.1% |
| A & P | 26.6% |
| Shop & Save | 17.0% |
| Thorofare | 14.0% |
| Kroger | 9.2% |
| Acme | 5.2% |

One year later the market shares were as follows:

| | |
|---|---|
| Foodland (Friedman) | 28.2% |
| A & P | 22.6% |
| Shop & Save | 16.6% |
| Kroger | 15.5% |
| Thorofare | 11.7% |
| Acme | 5.4% [15] |

From this uncontradicted market data, we conclude that Kroger did not have sufficient market power to come dangerously close to monopolizing the Butler area retail grocery market.

### III.

■ As we noted at the outset, summary judgment should be used sparingly in anti-

trust cases. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1961). However, Rule 56 should not "be read out of antitrust cases," *First National Bank v. Cities Service*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968), and "the question whether summary judgment is appropriate in any case is one to be decided on the particular facts of that case . . . ." *Id.* at 259, 88 S.Ct. at 1577. We think the language quoted by the district court from *Tripoli Co. v. Wella Corp.*, 425 F.2d 932 (3d Cir.) (en banc), *cert. denied*, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970), is apposite. In *Tripoli* we stated:

> "Even in an antitrust case a party must now come forward with affidavits setting forth specific facts showing that there is a genuine issue for trial.
>
>> 'What Rule 56(e) does not make clear is that a party cannot rest on the allegations contained in his complaint in opposition to a properly supported summary judgment motion against him.
>>
>> \* \* \* \* \* \*
>>
>> While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.' "

*Id.* at 935–36, *quoting First National Bank, supra*, 391 U.S. at 289–90, 88 S.Ct. 1575.

The order of the district court, granting defendant's motion for partial summary judgment as to the Sherman Act counts of plaintiff's complaint, will be affirmed.

---

**15.** These statistics are based on affidavits and depositions of grocery store operators in the Butler area as to their average monthly sales for the years in question and upon Friedman's answers to interrogatories stating his monthly sales figures. This material is reproduced at 88a, 108–09a, 206–09a, 210a, 212–14a, 218–20a.