Oma H. HESTER, Jr., Appellant,

v.

MARTINDALE–HUBBELL, INC.; American Bar Association and North Carolina State Bar, Appellees.

No. 80–1481.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 5, 1981.

Decided Sept. 16, 1981.

Noel Lee Allen, Raleigh, N.C. (Barringer, Allen & Pinnix, Raleigh, N.C., on brief), for appellant.

Allan R. Gitter, Winston-Salem, N.C. (William F. Womble, Winston-Salem, N.C., on brief), for appellee Martindale-Hubbell, Inc.

John V. Hunter, III, Raleigh, N.C., for appellee American Bar Assn.

H. D. Coley, Jr., Raleigh, N.C., on brief, for appellee North Carolina State Bar.

Before WINTER, Chief Judge, and RUSSELL and PHILLIPS, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge:

Oma H. Hester, a North Carolina attorney, appeals the grant of summary judgment dismissing his several claims of violations by Martindale-Hubbell, Inc., the American Bar Association (ABA) and the North Carolina State Bar (State Bar) of rights secured to him by the federal constitution and federal and state antitrust statutes in connection with his unsuccessful attempt to advertise in Martindale-Hubbell's general legal directory. Essentially for reasons stated by the district court, we affirm.

I

The facts, as presented to the district court on the summary judgment record,

were that the State Bar, with the approval of the North Carolina Supreme Court, had promulgated the North Carolina Code of Professional Responsibility, the provisions of which were substantially identical to the American Bar Association's Code of Professional Responsibility. At the time the actions that are the subject of this suit took place in late 1973 and early 1974, DR 2–102(A)(6) of the North Carolina Code provided that an attorney could present brief biographical and other specified information in a reputable law list or legal directory and "[a] law list or any directory is conclusively established to be reputable if it is certified by the American Bar Association as being in compliance with its rules and standards." *

From the late 1930's until February 1978, the ABA maintained a Standing Committee on Law Lists (Committee) that promulgated rules and standards with which a law list publisher could comply and receive certification by the Committee. Rule and Standard 4 promulgated by the Committee provided that "[t]he publisher of a law list which has received a certificate of compliance from the Committee may rate its listees in a manner not disapproved of by the Committee," and the Committee also published five rulings to serve as guidelines for any publisher who wished to establish a rating system.

From the inception of this private regulatory scheme, Martindale-Hubbell voluntarily submitted to a review of its publication practices by the Committee and each year received a certificate of compliance from the Committee. In 1977, Martindale-Hubbell's Legal Directory was listed as one of sixty law lists certified to be reputable by the Committee. It was, however, the only one listed in the category of "general legal directory."

The Martindale-Hubbell Law Directory is divided into two sections. In the geographical section, Martindale-Hubbell undertakes to list without charge the name of every lawyer, law firm and professional corporation in the United States. In addition to the lawyer's name, these individual alphabetical listings include, in a coded format in fine print, information such as years of birth and admission to the bar, college and law school attended, address, and firm connection or corporate or government employment. Ratings, based upon a system approved by the Committee, are also included with a large number of the individual and firm listings.

The second section of the directory is a biographical one in which lawyers may pay to have published advertisements that are euphemistically referred to by Martindale-Hubbell as "professional cards." These "professional cards" appear in boldface print and may include a broad array of biographical data in addition to that found in the geographical section together with information about areas of practice, references and representative clients. In order to subscribe to publication of a "professional card" in the biographical section, however, an attorney must have received a certain rating under Martindale-Hubbell's system or be associated with a firm that has obtained that distinction.

In August 1973, Hester requested information from Martindale-Hubbell concerning publication of a "professional card" in Martindale-Hubbell's 1974 edition. The publisher refused to supply this information to Hester, however, because he was ineligible to have a "professional card" published in the directory inasmuch as he had not yet received a rating.

Hester then addressed letters of formal complaint to the State Bar and the ABA in which he alleged that the management and contents of the Martindale-Hubbell Law Directory were in violation of DR2–102(A)(6). The State Bar responded that, since the ABA had issued a certificate of compliance

---

* DR2–102(A)(6) was amended in 1978 to delete the reference to certification by the ABA. Thus, the only standard that remains for establishing the reputability of a law list is the statement in the rule that "[a] law list or any directory is not reputable if its management or contents are likely to be misleading or injurious to the public or to the profession." DR2–102(A)(5).

to Martindale-Hubbell, Hester's complaint was one properly directed to that organization. Hester subsequently received a reply from the Committee stating that Martindale-Hubbell had in no way violated the Committee's rules and standards for law lists in refusing to publish Hester's "professional card." Hester then filed the present suit.

In the first count of his complaint Hester alleged that, by effectively sanctioning Martindale-Hubbell's refusal to publish his "professional card" in the biographical section of its directory, the ABA and the State Bar combined with Martindale-Hubbell to exclude Hester from the market for this form of legal advertising in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. In a second count he alleged that Martindale-Hubbell, with the cooperation of the ABA, monopolized or attempted to monopolize the market for advertising in legal directories of Martindale-Hubbell's comprehensiveness and scope of distribution in violation of section 2 of the Sherman Act, 15 U.S.C. § 2.

In third and fourth counts, incorporating by reference the allegations of concerted anticompetitive activity, Hester alleged that this activity also constituted a violation of N.C.Gen.Stat. § 75–1, the North Carolina analogue of the Sherman Act, and of N.C. Gen.Stat. § 75–1.1, the North Carolina analogue of section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Finally, in counts five and six of the complaint Hester alleged that the State Bar, by condoning the allegedly discriminatory refusal of Martindale-Hubbell to publish his "professional card" and refusing to consider his complaint against that publisher, had violated his rights to equal protection and due process of law under the fourteenth amendment to the United States Constitution and article 1, section 19 of the North Carolina Constitution.

Following two years of discovery in which Hester received responses to his interrogatories, requests for admissions and requests for production of documents from all three defendants, Martindale-Hubbell and the State Bar moved for summary judgment. Upon review of the summary judgment record, a magistrate recommended denial of the motions. The district court, however, rejected this recommendation, granted the motions and, *sua sponte*, dismissed the claims against the ABA.

In a thorough memorandum opinion the court concluded that Hester could not succeed on his allegation of a violation of section 1 of the Sherman Act because he had failed to present sufficient evidence of a conspiracy or concerted activity. *Hester v. Martindale-Hubbell, Inc.*, 493 F.Supp. 335, 337–40 (E.D.N.C.1980). Turning to Hester's allegation that Martindale-Hubbell was a monopolist in violation of section 2 of the Sherman Act, the court concluded that on the record presented Martindale-Hubbell had not unlawfully attained or maintained any monopoly position it might have acquired. *Id.* at 340–41. Having found no evidence showing concerted activity in restraint of trade in violation of the Sherman Act, the court also rejected Hester's claims under N.C.Gen.Stat. §§ 75–1 and 75–1.1. *Id.* at 341. Finally, the district court rejected as moot Hester's prayer for injunctive and declaratory relief declaring DR2–102(A)(6) violative of the United States and North Carolina Constitutions and ordering the State Bar to consider his complaint because that disciplinary rule had since been amended to abolish the certification process of which Hester complained. *Id.* at 341–42.

## II

We agree with the district court's ultimate disposition of Hester's claims and, with one exception, with the reasoning the district court used to reach that result. We think that Hester's claim of an illegal combination in restraint of trade between the three defendants failed on a basis other than that essentially relied upon by the district court.

In rejecting this claim the district court relied primarily on the Supreme Court's decision in *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), and

the Third Circuit's later analysis of *Albrecht* in *Harold Friedman, Inc. v. Kroger Co.*, 581 F.2d 1068 (3d Cir. 1978). We think that those cases, however, are inapposite. In both *Albrecht* and *Harold Friedman, Inc.*, an express agreement was conceded, and the question was whether that agreement was incidental or essential to a restraint of trade. In the present case, on the other hand, there was clearly a restraint of trade in the form of restricted access to advertising, and the dispositive question presented on the summary judgment record was whether that restraint was the result of the concerted activity of the ABA, the State Bar and Martindale-Hubbell or merely the unilateral action of Martindale-Hubbell. We hold that the requisite concerted activity was not established on the record presented.

Both the Supreme Court, *see United States v. Colgate Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), and much more recently this court, *see Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia*, 624 F.2d 476, 483 (4th Cir. 1980), have recognized, in considering antitrust claims, that a business may unilaterally choose those with whom it will conduct business. Courts considering claims of violations of the antitrust laws, of course, must be "sensitive to the realities of the marketplace," *id.* at 481, and therefore have extended the concept of concerted activity far beyond the classic case of an actual agreement to engage in a common course of conduct. But we are satisfied that this case, as presented for decision on the summary judgment record, lies beyond the pale of even the most liberal extension of the concept of concerted activity.

This is not a case in which those at a lower level of competition have conspired to force a supplier at a higher level of competition to impose some restraint. *See, e. g., United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). Nor is it a case in which a supplier

at a higher level of competition has coerced those at a lower level of competition to acquiesce in some anticompetitive endeavor. *See, e. g., United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960).

Instead, Hester's proferred proof shows at best only that the State Bar and the ABA had undertaken to establish standards and rules for certain aspects of law list publishing and had discouraged attorneys from listing themselves with those publishers who did not comply with those rules and standards, that the ABA had established guidelines for the rating of lawyers by law lists and that Martindale-Hubbell had complied with those guidelines and had accordingly received a certificate of compliance from the ABA. There was no showing on the record, nor was it ever alleged, however, that the ABA required, or even suggested, that Martindale-Hubbell condition the right to advertise in its publication on the attainment of a certain rating, which was the restraint of trade alleged in this case. Thus, at best, Hester's proferred proof established only that the ABA and the State Bar did not prevent Martindale-Hubbell from refusing to publish his advertisement when they arguably had the influence to do so. Such evidence simply does not show a concerted refusal to deal within contemplation of the laws invoked.

*AFFIRMED.*

WINTER, Chief Judge, concurring and dissenting:

In my view, the majority applies too narrow a definition of "concerted activity" to the facts of this case. I would conclude that the district court erred in granting summary judgment for defendants on Hester's claims under § 1 of the Sherman Act. From the majority's conclusion to the contrary, I respectfully dissent.[1]

I.

As the majority points out, it is plain that Martindale-Hubbell's restrictive advertising

1. Because N.C.Gen.Stat. § 75–1 is the state equivalent of Sherman Act § 1, I would reverse the dismissal of Hester's claim under that sec- tion as well. I concur in the majority's decision to affirm summary judgment for defendants with regard to Hester's other claims.

policies result in a restraint of trade. The impact of that restraint on Mr. Hester and others in similar positions is self-evident. Martindale-Hubbell is the only general legal directory in the nation and the only law list of any kind that publishes ratings of listed lawyers. Its preeminence as a tool in securing legal services in distant places and in referring legal business to out-of-town lawyers is well-known among legal practitioners. Under current advertising policies, Martindale-Hubbell denies Hester and others a chance to list their names and certain other data in its widely-used Biographical Section, relegating their listings to the relative obscurity of the fine print in its Geographical Section.

The exclusion of Hester and others results from Martindale-Hubbell's system of "rating" attorneys. In order to purchase a listing in the Biographical Section, an attorney must receive an "av" or a "bv" rating or practice in association with a firm which has received such a rating. A lawyer must practice at least five years to receive a "bv" rating and ten years to receive an "av." To determine an attorney's rating, Martindale-Hubbell solicits assessments of the legal skills, industry and trustworthiness of individual lawyers by addressing questionnaires to judges and attorneys in the local area where the individual practices.

There can be no doubt that the impact of this policy is to lessen competition. Long-established firms receive listings not only for their more experienced lawyers but for their newest associates as well. Those lawyers who have practiced at least five years and who are sufficiently regarded by their professional colleagues are given the privilege of effective advertising with the consequence of increasing their business. The young solo practitioner, the experienced lawyer beginning to practice in a new locality even after years of experience elsewhere,[2] and the maverick who has forfeited an objective appraisal of his qualifications by his colleagues are denied this opportunity. The policy thus permits established firms and lawyers to increase their competitive advantage and compounds the already difficult task of new entrants seeking to sell their services in local markets.

## II.

Despite the obvious restraint of trade which results from Martindale-Hubbell's advertising policy, the majority finds that policy beyond the reach of § 1 of the Sherman Act because it represents a unilateral decision on the part of Martindale-Hubbell and does not result from unlawful concerted activity. I believe the majority errs by applying a definition of "concerted activity" considerably narrower than that approved by the Supreme Court in *Albrecht v. The Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), the Court's most recent treatment of this issue.

The majority finds no evidence of concerted activity because there is no showing that "the ABA required, or even suggested, that Martindale-Hubbell condition the right to advertise in its publication on the attainment of a certain rating." At 436. Under *Albrecht*, however, it is irrelevant that one party unilaterally formulated a policy restraining trade, if he sought and received the assistance of another party which acted with knowledge of the restraint. In *Albrecht*, a newspaper publisher required its independent distributors to sell its papers at a price no higher than it suggested. When Albrecht, one of its distributors, raised his prices, the publisher hired Milne Circulation Sales, Inc. to undertake a telephone solicitation campaign designed to convince Albrecht's customers to switch to a new distributor. The publisher also authorized George Kroner, another distributor, to deliver papers to customers who decided to remove themselves from Albrecht's route. Both Kroner and Milne were aware that the publisher sought to enforce its retail pricing policy.

---

**2.** Hester fits in this category himself. He graduated from law school in 1950, but served as a lawyer in the armed services until 1972. Even had he been in private practice elsewhere before moving to Hickory, North Carolina, Hester would have been excluded. Under Martindale-Hubbell's policy, ratings are not automatically transferable from one locality to another.

The Supreme Court found illegal concerted activity in this combination, despite the fact that neither Kroner nor Milne "required" or "suggested" resale price maintenance or participated in any way in the formulation of the publisher's pricing policy. To establish concerted activity within the meaning of Sherman Act § 1, it was sufficient that Kroner and Milne were aware of the anticompetitive purpose of the publisher's scheme and that they "materially aided in the accomplishment" of its plan. 390 U.S. at 150, 88 S.Ct. at 871.[3]

Under the *Albrecht* standard, there is in this case undisputed evidence of concerted activity. For decades before commencement of this suit, Martindale-Hubbell pursued an advertising policy with obvious anticompetitive effects. Because lawyers were forbidden by codes of ethics such as that promulgated by the North Carolina State Bar from advertising in other than "reputable" law lists, and because lists certified by the ABA were conclusively determined to be "reputable," approval by the ABA of the Martindale-Hubbell scheme was necessary to the very existence of the publication.[4] Although it possessed the power, as a practical matter, to require Martindale-Hubbell to change its advertising policy in any way it saw fit, and although it was undoubtedly aware of the anticompetitive impact of Martindale-Hubbell's policies, the ABA lent its stamp of approval to that policy for over forty years.

The ABA's support of Martindale's policy went beyond its annual certification. The ABA Committee on Ethics issued Informal Opinion 55 which permits attorneys to respond to questions asked by a law list publisher in the course of rating other attorneys. Because Martindale-Hubbell has long been the only law list publishing ratings of listed lawyers, the ABA must have issued Informal Opinion 55 with the specific intention of facilitating the very practices Hester now challenges as a restraint of trade.

In the language of *Albrecht*, the ABA, in my view, "materially aided" Martindale-Hubbell in pursuing a policy with known anticompetitive effects, by providing the annual certification necessary to the continued existence of that policy and by granting the approval necessary for lawyers to participate in the rating of their competitors. Under the alternative formulation of *United States v. Parke, Davis & Co.*, 362 U.S. 29, 44, 80 S.Ct. 503, 511, 4 L.Ed.2d 505 (1960), Martindale-Hubbell maintained its restrictive policy by means in addition to the "mere announcement of [the] policy and the simple refusal to deal." It maintained its exclusionary policy by seeking and receiving approval of that policy and assistance in carrying it out from the ABA, whose practical power to control attorney advertising made it an indispensable partner in the venture. This symbiotic relationship between the ABA and Martindale-Hubbell offers a classic example of the danger which led Congress in 1890 to focus its attention on concerted actions in restraint of trade. By acting in concert, the parties created a restraint considerably more effective than that either could have created on its own.[5]

**3.** This view of concerted activity was not new even with *Albrecht*. Eight years earlier, the Court had held that "an illegal combination to fix prices results if a seller suggests resale prices and secures compliance by means in addition to the 'mere announcement of his policy and the simple refusal to deal.'" *Albrecht v. The Herald Co.*, 390 U.S. 145, 149, 88 S.Ct. 869, 871, 19 L.Ed.2d 998 (1968), *quoting United States v. Parke, Davis & Co.*, 362 U.S. 29, 44, 80 S.Ct. 503, 511, 4 L.Ed.2d 505 (1960).

**4.** Martindale-Hubbell disputes this point, claiming that even without ABA certification it could prove itself to be "reputable" by showing that "its management [and] contents are [not] likely to be misleading or injurious to the public or to the profession." DR 2–102(A)(6). For all practical purposes, however, ABA certification was the only route to "reputability," before the 1978 amendments to DR 2–102(A)(6), because a lawyer publishing in a non-certified list would take the chance of its later being found not "reputable." It is probably for this reason that no non-ABA sanctioned list was ever published before this lawsuit.

**5.** Even under a more restrictive definition of "concerted activity," I would have serious reservations about affirming summary judgment on the § 1 claim. Actual agreements to restrain trade are seldom proved by direct evidence; more often they must be inferred from all the circumstances of a particular case.

To avoid the result *Albrecht* requires, defendants advance two related arguments. First, they contend, the ABA would have certified Martindale-Hubbell whether or not it pursued the restrictive policy challenged here. This contention cannot avail defendants, however, any more than it would have aided Milne Circulation Sales, Inc. to point out that it would have solicited customers for *The Herald* whether for the purpose of punishing Albrecht or simply to increase circulation. What matters is that the ABA, like Milne, lent material assistance to a pursuit which it knew would result in a restraint of trade.

Second, in what is really a restatement of the same argument, defendants suggest that ABA certification of Martindale-Hubbell represents only a general approval of the publication as "reputable," and in no way reflects the ABA's judgment as to the exclusionary advertising policy. Even if this argument made any difference under the *Albrecht* rationale, I would find that the record fails to support the contention as a factual matter. In fact, ABA approval of Martindale represents much more than a generalized assessment that the publication is "reputable." In 1941, the Standing Committee on Law Lists promulgated a series of specific Rules and Standards which it has since applied in certifying law lists. Among other things, those rules prohibit the giving of "preferential prominence . . . to the name of any listed attorney or attorneys, by different size or character of type . . . ." Rule and Standard 3. That rule, on its face, would appear to prohibit the very practice challenged here: the printing of selected names in larger print in a Biographical Section while others are listed in smaller print in the Geographical Section. Because the rules also permit the printing of "professional cards" in a Biographical Section of a law list, Rule and Standard 3 has apparently been interpreted to permit Martindale-Hubbell's practice. Regardless of the correctness of that interpretation, the fact remains that in order to certify Martindale-Hubbell, ABA representatives had to consider and approve the specific restraint challenged in this lawsuit.

## III.

In concluding that the facts of this case would permit the conclusion that the requisite concerted activity to constitute an antitrust violation was present and thus summary judgment for defendants was in error, I am constrained to add that this conclusion reflects nothing regarding the possible motives of the defendants. Whether Martindale-Hubbell or the ABA actually desired to restrain competition among lawyers, or whether they sought only to uphold professional standards and protect the public from deceptive advertising, the antitrust inquiry is the same. Defendants would violate § 1 by knowingly engaging in concerted activity which has the effect of restraining competition, even though the motive behind the action may have borne no relation to competition or may have been wholly altruistic.

Drawing inferences favorable to Hester, a jury might find an illegal agreement in this case. There was certainly ample opportunity for conspiracy during the parties' forty-year course of dealing. The ABA regularly dispatched representatives to Martindale-Hubbell's offices to inspect the operation of its rating system. The record discloses at least one instance where a Martindale-Hubbell vice president attended the annual meeting of the Standing Committee on Law Lists. In addition, one could conclude that the ABA had a motive to promote the restraint alleged, since it favors the very practitioners who hold most positions of power and influence in the ABA. In this regard, it is worth noting that all members of the Standing Committee at the time Hester first complained of Martindale-Hubbell's policies were lawyers whose names appeared in the Biographical Section of the directory.

In addition, even if the district court was correct in finding no concerted action between Martindale-Hubbell and the ABA, it erred in dismissing *sua sponte* the § 1 claim against the ABA. The ABA is itself a voluntary association of competitors. It need not join with any other party for its actions to constitute "concerted activity" within the meaning of the Sherman Act. *See National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). To establish the liability of the ABA, it was sufficient to show that the Association knowingly undertook an action which had the effect of restraining competition.

See, *National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); *Silver v. New York Stock Exchange*, 373 U.S. 341, 347, 83 S.Ct. 1246, 1251, 10 L.Ed.2d 389 (1963).