**CENTRAL CHEMICAL CORPORATION**

v.

**AGRICO CHEMICAL COMPANY.**

Civ. No. W-76-974.

United States District Court, D. Maryland.

Jan. 29, 1982.

Jeffrey D. Herschman, Baltimore, Md., for plaintiff; Louis A. Noonberg, Baltimore, Md., on brief.

Kent L. Jones and Hall, Estill, Hardwick, Cable & Collingsworth, Tulsa, Okl., for defendant; Mack Muratet Braly & Associates, Tulsa, Okl., Miles & Stockbridge, Baltimore, Md., on brief.

WATKINS, Senior District Judge.

This case is before the Court on defendant's Motion to Dismiss that Portion of Count Four of the Amended Complaint Alleging Violations of Section 3 of the Clayton Act and its Motion for Summary Judgment on Count IV of the Amended Complaint. For the reasons stated herein, this Court will grant both motions.

Plaintiff Central Chemical Corporation (Central) is a Maryland corporation engaged in the business of blending and marketing fertilizers for agricultural uses. Defendant Agrico Chemical Company (Agrico) is a Delaware corporation with its principal office and place of business in Tulsa, Oklahoma. Agrico is engaged in the business of

mining, producing, processing, and selling various fertilizer raw materials, including nitrates and phosphates, and of purchasing for resale muriate of potash (MP). There is some evidence to indicate that Agrico is also engaged in the business of blending and marketing agricultural fertilizers.

In its Amended Complaint, plaintiff avers that prior to the events which precipitated this lawsuit, Agrico had supplied Central with raw materials under the terms of a written contract. According to plaintiff, this business relationship existed during FY 1972 and FY 1973.[1] For the period covering FY 1974, however, the parties' negotiation efforts did not culminate in a written contract. Instead, plaintiff refused to enter into a long-term requirements contract and defendant refused to supply quantities of scarce di-ammonium phosphate (DAP) and granular triple super phosphate (GTSP) to the plaintiff.

In Counts I and II of the original complaint, plaintiff sought recovery under this Court's diversity jurisdiction for injuries suffered due to defendant's failure to supply plaintiff with quantities of certain fertilizer raw materials during FY 1974. Plaintiff claimed that defendant's failure to supply the raw materials was a breach of contract or, alternatively, gave rise to an action based on promissory estoppel.

Subsequently, plaintiff amended its complaint to add Count IV.[2] In this count, plaintiff alleges that certain actions taken by defendant, some of which arose out of the same transaction at issue in Counts I and II, violated the antitrust laws, and that plaintiff was injured thereby. Central claims that the various terms under which certain other customers purchased DAP and GTSP from Agrico constituted illegal tying arrangements, or prohibited exclusive dealing contracts. Central further alleges that Agrico's refusal to supply Central with DAP and GTSP was a refusal to deal in

1. The initials "FY" denote "fertilizer year," which includes the one-year period preceding July 1 of the year designated. Industry records and the parties' allegations utilize such designation and the Court will, for the sake of consistency and brevity, follow suit.

2. Count III of the original complaint was dismissed by this Court on July 28, 1977. The claims in that count have no relevance to the discussion herein.

furtherance of an illegal conspiracy. Central also claims that because of the national shortage in DAP and GTSP during FY 1974, Agrico was a monopolist in these scarce materials, and that Agrico abused this monopoly power by refusing to use reasonable selection criteria in allocating these scarce materials. Finally, Central claims that Agrico was attempting to monopolize the wholesale and retail markets in DAP and GTSP in the Eastern United States.

### Tying and Exclusive Dealing Claims

Plaintiff alleges that defendant tied the purchase of DAP and GTSP to the purchase of urea and MP, and to the purchase of paper bags used in the resale of the blended fertilizer products. Plaintiff also alleges that Agrico required certain customers to enter into "executive accounts": exclusive dealing contracts wherein these customers would agree over a five-year period to purchase all of their requirements of specific raw materials from Agrico.

Central argues that Agrico's refusal to supply Central with scarce DAP and GTSP in FY 1974 was due to Central's decisions not to enter into illegal tying arrangements,[3] and not to accept a five-year exclusive dealing contract. Central concludes that it was injured by Agrico's refusal to deal, and that this refusal to deal is illegal under the Clayton Act. Section 3 of the Clayton Act provides in pertinent part:

It shall be unlawful for any person . . . to lease or make a sale or contract for sale of goods . . . on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods . . . of a competitor or competitors of the lessor or seller, where the effect of such lease, sale or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14. The same conduct proscribed by this statute may in some cases violate Section 1 of the Sherman Act, 15 U.S.C. § 1,[4] *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969), and to the extent that the alleged arrangements would violate Section 1, plaintiff argues that they are illegal under the Sherman Act as well.

Neither Section 3 of the Clayton Act nor Section 1 of the Sherman Act creates a private right of action for money damages. That right is conferred by Section 4 of the Clayton Act, which provides that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" may sue to recover treble damages. 15 U.S.C. § 15. Agrico argues that Central lacks standing under Section 4 of the Clayton Act to raise a claim as to any alleged violation of Section 3 of that Act, or to raise a claim as to certain alleged violations of Section 1 of the Sherman Act.[5] Hence, Agrico asserts that Central's claims of illegal tying

---

**3.** In *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953), the Supreme Court stated: "The common core of the adjudicated unlawful tying arrangements is the *forced purchase* of a second distinct commodity with the desired purchase of a dominant 'tying' product, resulting in economic harm to competition in the 'tied' market." 345 U.S. at 614, 73 S.Ct. at 883 (emphasis added).

**4.** In pertinent part, Section 1 proscribes "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1.

**5.** Although Agrico does not delineate which alleged violations would, if proven, fall under the ambit of 15 U.S.C. § 1 and/or 15 U.S.C.

§ 14, the defendant does recognize the applicability of both statutes. Nonetheless, Agrico contests Central's standing as to all alleged violations falling under both statutes except for the sole claim arising under 15 U.S.C. § 1, *see* pp. 10–21, *infra*, concerning Agrico's refusal to deal with Central. *See* Reply Memorandum in Support of Defendant's Motion for Summary Judgment on Count IV, at 1–3. Thus, with respect to the tying and exclusive dealing claims about which Agrico does contest standing, the requirements of 15 U.S.C. § 15 equally apply to the claims whether they fall under one of the statutes exclusively or under § 3 of the Clayton Act as well as § 1 of the Sherman Act.

and exclusive dealing should be dismissed pursuant to F.R.Civ.P. 12(b)(1).[6]

In order to have standing to bring a claim under Section 4 of the Clayton Act, a plaintiff must have suffered injury "by reason of" the alleged antitrust violation. 15 U.S.C. § 15. *See Ratliff v. Burney*, 657 F.2d 640, 642 (4 Cir. 1981). Moreover, the injury suffered must be of the "type that the statute was intended to forestall." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487–88, 97 S.Ct. 690, 696–97, 50 L.Ed.2d 701 (1977) (*citing Wyandotte Transportation Co. v. United States*, 389 U.S. 191, 202, 88 S.Ct. 379, 386, 19 L.Ed.2d 407 (1967). In *Brunswick*, the plaintiff claimed to have suffered injury by reason of an illegal merger between the defendant and some of plaintiff's failing competitors. The only injury which the plaintiff in *Brunswick* could show was that competition revived after the merger, and that the plaintiff's profits were lessened thereby. The Supreme Court held that the plaintiff had failed to produce evidence sufficient to recover on its illegal merger claim. 429 U.S. 488–89, 97 S.Ct. 697.

The Court in *Brunswick* specifically addressed the nature of the injury which the plaintiff must show to comply with the standing requirement in Section 4 of the Clayton Act:

> We therefore hold that for plaintiffs to recover ... they must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible

**6.** Agrico argues that there was no contract for sale of goods between Central and Agrico, and that, because this necessary element of a § 3 violation was lacking, this claim should be dismissed pursuant to Rule 12(b)(6). Recently, this Court ruled that there is a genuine issue of fact as to whether an enforceable contract for the sale of goods existed between the parties; consequently, on consideration of the instant motion to dismiss, this argument cannot prevail.

Agrico also argues that plaintiff failed to plead that the oral contract in question contained a condition which violates § 3 of the Clayton Act. Although this pleading issue need not necessarily be considered in view of the Court's ruling on standing, the Court finds that defendant's argument has merit.

In order to plead a cause of action under § 3, plaintiff must allege that a contract for sale of goods between Agrico and Central, not Agrico and others, was conditioned on a promise of not dealing in the goods of a competitor, as is the case in a tying arrangement or in an exclusive dealing transaction. *See, e.g., McElhenney Co. v. Western Auto Supply Co.*, 269 F.2d 332, 336 (4 Cir. 1959); *Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911, 913 (5 Cir. 1952), *cert. denied*, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953); *Thomas v. Amerada Hess Corp.*, 393 F.Supp. 58, 76 (M.D.Pa.1975).

Plaintiff claims that ¶ 19(a), (b) of the Amended Complaint, as found in the More Definite Statement, alleges a tying element. The Court finds that the cited paragraph alleges only that Agrico generally required contracting parties to tie the purchase of MP and urea to the purchase of DAP and GTSP; no specific allegation is made in the Amended Complaint that this condition was within the terms of the alleged contract between Central and Agrico. *See also* ¶¶ 6 and 7 of the Complaint; ¶¶ 13, 16 of the Amended Complaint. In fact, the tying allegation relating to MP and urea in ¶ 19(a), (b) is written in the same language as that used in ¶ 19(c) which alleges that Agrico tied the purchase of paper bags to the purchase of DAP and GTSP. Yet, ¶ 16 of the Amended Complaint expressly states that a condition relating to paper bags was *not* a term of the contract between Agrico and Central.

Similarly, ¶ 19(d), (e) of the Amended Complaint refers to a contractual term imposing an exclusive dealing (or five-year) requirement. Paragraph 16 of the same complaint, however, states that the alleged contract between Agrico and Central contained *no* exclusive dealing (or five-year requirement) term.

Therefore, it is extremely difficult, if not improper, to interpret the general allegations of ¶ 19 as terms actually imposed in the alleged contract between Agrico and Central. Because plaintiff presents the "offenses" which ground its antitrust claims solely within ¶ 19, the Court notes that is very difficult to find a condition in Agrico's alleged contract with Central which would constitute a cause of action under § 3 of the Clayton Act. Although the Court notes that Agrico's motion to dismiss the § 3 ground has merit, the Court also notes that under liberal pleading practices Central would have the opportunity to amend its Amended Complaint to correct this defect.

by the violation. It should, in short, be "the type of loss that the claimed violations ... would be likely to cause." *Zenith Radio Corp. v. Hazeltine Research,* 395 U.S. [100, 125, 89 S.Ct. 1562, 1577, 23 L.Ed.2d 129 (1969)].

*Id.* at 489, 97 S.Ct. at 697 (emphasis in original). In applying *Brunswick,* the Court therefore must inquire as to the "anticompetitive effect" of an illegal tying or exclusive dealing arrangement, the alleged violations at issue.

In *David R. McGeorge Car Co. v. Leyland Motor Sales, Inc.,* 504 F.2d 52 (4 Cir. 1974), *cert. denied,* 420 U.S. 992, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1975), the Fourth Circuit analyzed the standing requirement by defining what constituted the anticompetitive effect of a tying arrangement: "[T]he vice of an illegal tie-in is the fact that the agreement or the effect thereof lessens competition in the tied product." 504 F.2d at 58. The Fifth Circuit has also considered the relationship between anticompetitive effect and the standing of plaintiffs to raise tying violations. *Southern Concrete Co. v. United States Steel Corp.,* 535 F.2d 313 (5 Cir. 1976), *cert. denied,* 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977). That court noted that in order to establish that the plaintiff has been injured by reason of an antitrust violation, he must show that he was in the "target area" of the alleged violation; *i.e.,* he must "show himself within the sector of economy in which the violation threatened a breakdown of competitive conditions." [7] *Id.* at 316. The Fifth Circuit analyzed tying arrangements in order to identify the sector of the economy effected thereby, and concluded:

> [T]he area of the economy threatened with a breakdown of competitive conditions because of a tying agreement is the market for the tied product; and those who will be proximately injured there-

by—in addition to the party subject to the tie—are competitors in the tied product.

*Id.* at 317. The Fifth Circuit held that because the plaintiff in *Southern Concrete* had not purchased the tied product from the defendant and did not sell the tied product to others, it lacked standing to raise any tying violations. *Id.*

In determining the appropriate standard by which to judge a plaintiff's standing to raise an illegal tying claim, the Court is mindful of the Supreme Court holding in the illegal merger case of *Brunswick* and of both binding and persuasive precedent in illegal tying cases in the Fourth and Fifth Circuits. *See also Payne v. Chrysler Motors Corp.,* 451 U.S. 557, 562, 101 S.Ct. 1923, 1927, 68 L.Ed.2d 442 (1981) (standing issue with respect to a 15 U.S.C. § 13(a) claim "governed" by the reasoning in *Brunswick*). Hence, the Court concludes that at a minimum, Central must allege injury to its business by reason of a foreclosure of competition in the tied product(s)—urea, MP, and paper bags used in the resale of the blended fertilizer products—in order to have standing to raise a tying violation claim.[8]

Central has never claimed that it competes with Agrico in the sale of urea, MP, or paper bags, particularly not with regard to sales of such products to the other parties subject to these allegedly illegal ties. Central also does not claim to have actually purchased goods under the contract at issue here. Rather, the allegations establish that, even assuming that the contract in question did contain a tying condition, Central did not receive any goods under that contract. The contract, therefore, remained unexecuted. Central, in fact, makes clear that its injury stems from Agrico's refusal to sell it any goods.

---

**7.** The Fourth Circuit adopted this "target area" test of standing in *South Carolina Council of Milk Producers, Inc. v. Newton,* 360 F.2d 414, 418 (4 Cir.), *cert. denied,* 385 U.S. 934, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966).

**8.** A plaintiff need only prove some damage flowing from the antitrust violation in order to

establish standing; any further proof goes to the amount of damages awarded. Also, a plaintiff need only show that the violation was a material cause of the injury; he need not eliminate all other causes. *Phillips v. Crown Cent. Petroleum Corp.,* 395 F.Supp. 735, 769 (D.Md.1975).

Alternatively, Central argues that because Agrico's refusal to sell it goods was due to Central's refusal to enter into certain other allegedly illegal tying arrangements with Agrico, injury from such a refusal to deal confers standing to raise the tying violations. The Fourth Circuit addressed this theory in reference to interpreting a claim under Section 3 of the Clayton Act. In *McElhenney Co. v. Western Auto Supply Co.*, 269 F.2d 332 (4 Cir. 1959), the court stated: "Neither in terms nor inferentially does the statute prohibit a unilateral refusal to sell. Its condemnations are directed against *executed transactions* of lease, sale or contract containing the forbidden condition, agreement or understanding." *Id.* at 337–38 (*dicta*) (emphasis added). *See Amplex of Maryland, Inc. v. Outboard Marine Corp.*, 380 F.2d 112 (4 Cir. 1967), *cert. denied*, 389 U.S. 1036, 88 S.Ct. 768, 19 L.Ed.2d 823 (1968) (affirming order granting motion to dismiss tying claim where refusal to deal by manufacturer was evident).

■ In *Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911, (5 Cir. 1952), *cert. denied*, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953), the Fifth Circuit stated:

> There is a real difference between the act of refusing to deal and the execution of a contract which prevents a person from dealing with another. The plaintiff [here] has not been injured by a contract, express or implied, which sought to prevent him from dealing in the goods of any competitor of the defendant.

*Id.* at 915–16. In the case at bar the plaintiff also has not been harmed by such a contract, because whether or not a contract for sale existed between the parties, it is undisputed that Central received no goods under the contract.

■ The same rationale dispenses with Central's claim that Agrico sought to impose illegal exclusive dealing conditions on the plaintiff. An exclusive dealing condition violates antitrust law if it would either substantially lessen competition or tend to create a monopoly. *Bowen v. New York News, Inc.*, 366 F.Supp. 651, 678 (S.D. N.Y.1973), *rev'd on other grounds*, 522 F.2d 1242 (2 Cir. 1975), *cert. denied*, 425 U.S. 936, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976). Nevertheless, absent a showing that the complained of transaction was executed, a plaintiff lacks standing to maintain an attack on an exclusive dealing requirement. *Ron Tonkin Gran Turismo, Inc., v. Fiat Distributors, Inc.*, 637 F.2d 1376, 1389 (9 Cir.), *cert. denied*, —— U.S. ——, 102 S.Ct. 128, 70 L.Ed.2d 109 (1981) ("Section 3 of the Clayton Act has no application in the absence of an executed agreement").[9]

Central urges the purported irony of a ruling that it should be denied standing to complain of the tying and exclusive dealing arrangements at issue simply because it did not enter into them, or receive goods under them. It suggests that it is anomalous that one would have to enter into and perform under an illegal arrangement in order to claim injury thereby. This argument, far from proving Central's point, merely demonstrates that Central can show no injury specifically arising out of the tying and exclusive dealing conditions; its injuries more appropriately relate to Agrico's refusal to deal.[10]

■ To reiterate, the evil which Section 3 of the Clayton Act is designed to prohibit is the foreclosure of competition in the product at issue. Here, however, no such competition was foreclosed. In fact,

9. Central argues that Agrico should have been required under the antitrust laws to offer a legal contract, one containing no tying condition. In fact, the law is settled that Agrico had no duty to offer any contract, and its failure to offer a legal contract in place of the allegedly illegal contract is only actionable if in furtherance of an illegal conspiracy. *See* discussion *infra* at p. 543.

10. One district court explained succinctly:

> Because it is not alleged that [plaintiff] purchased any of the tied products, it has no direct claim for relief from the tying arrangement under Section 3 of the Clayton Act (15 U.S.C. § 14). Rather, it is limited to relief under Sherman Antitrust Act §§ 1 and 2 (15 U.S.C. §§ 1 and 2).

> *Unibrand Tire & Product Co. v. Armstrong Rubber Co.*, 429 F.Supp. 470, 474 (W.D.N.Y. 1977).

what Central complains of is that it was thrust out into the market to deal with Agrico's competitors.[11] Therefore, under this Court's interpretation of the test in *Brunswick*, Central lacks standing to raise a tying or exclusive dealing claim through Section 3 of the Clayton Act or through Section 1 of the Sherman Act. Accordingly, the tying and exclusive dealing claims will be dismissed pursuant to Rule 12(b)(1).

### Refusal to Deal

■■■■ Central claims that Agrico's refusal to supply raw materials to Central in FY 1974 constituted a refusal to deal unlawfully under Section 1 of the Sherman Act. All refusals to deal do not necessarily run afoul of Section 1. In 1919, the Supreme Court stated:

> In the absence of any purpose to create or maintain a monopoly, the [Sherman] act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.

*United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919). Notwithstanding the *Colgate* doctrine, certain apparently unilateral activity [12] will state a claim under the Sherman Act if such action was taken in the furtherance of a conspiracy to unreasonably restrain trade. *Albrecht v. Herald Co.*, 390 U.S. 145, 149–50, 88 S.Ct. 869, 871, 19 L.Ed.2d 998 (1968); *United States v. General Motors Corp.*, 384 U.S. 127, 142–45, 86 S.Ct. 1321, 1329–30, 16 L.Ed.2d 415 (1966);

*United States v. Parke, Davis & Co.*, 362 U.S. 29, 36–45, 80 S.Ct. 503, 507–512, 4 L.Ed.2d 505 (1960); *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025, 1029–30 (2 Cir.), *cert. denied*, 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1979); *Lee-Moore Oil Co. v. Union Oil Co.*, 599 F.2d 1299, 1301–02 (4 Cir. 1979); *Osborn v. Sinclair Refining Co.*, 324 F.2d 566, 571, 574 (4 Cir. 1963) (appeal *after remand*). Central argues that Agrico's refusal to deal was in furtherance of such a forbidden conspiracy.

■■■■ Defendant moves for summary judgment as to this claim. Agrico argues there is no proof of any conspiracy involving Agrico. Alternatively, the defendant maintains that if evidence existed from which an agreement between Agrico and other parties in restraint of trade could be inferred, there is no evidence to suggest a causal connection between the conspiracy alleged and Agrico's refusal to deal with Central. In considering a motion for summary judgment, the Court must resolve all factual disputes in favor of the non-moving party and must draw all reasonable factual inferences in favor of the non-moving party. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Morrison v. Nissan Motor Co.*, 601 F.2d 139 (4 Cir. 1979). The Court may grant such a motion only if the Court determines that there is no genuine issue as to any material facts and that the defendant is entitled to judgment as a matter of law.[13] F.R.Civ.P. 56.

■■■■ Accordingly, the Court is of the opinion that plaintiff has brought forth suf-

---

11. Neither *Osborn v. Sinclair Refining Co.*, 286 F.2d 832, 836 (4 Cir. 1960), *cert. denied*, 366 U.S. 963, 81 S.Ct. 1924, 6 L.Ed.2d 1255 (1961) [Osborn I] nor *Osborn v. Sinclair Refining Co.*, 324 F.2d 566 (4 Cir. 1963) [Osborn II] (appeal *after remand*), upon which plaintiff relies, is to the contrary. In *Osborn I*, the distributor had been a party to the tying arrangement and had purchased goods under that arrangement, and the Fourth Circuit held that it therefore had standing to complain of the tying violations. 286 F.2d at 839–40. That is simply not the case here. It is important to note that other parties, including purchasers under the alleged tying contracts, Agrico's competitors, and the United States have standing to raise such claims.

12. A "unilateral" refusal to deal is defined as an independent decision by one person or business not to sell to, or buy from, another person or business. 8 J. Von Kalinowski, Antitrust Laws and Trade Regulation § 60.02 (1981).

13. Although the Supreme Court has cautioned against granting summary judgment too quickly in complex antitrust litigation, *Poller*, 368 U.S. at 473, 82 S.Ct. at 491, it has explicitly ruled that summary judgment is appropriate in such cases where the Rule 56 standard is satisfied. *First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

ficient evidence to permit an inference that a conspiracy existed between Agrico and certain independent parties who entered into agreements termed "executive accounts." The major components of this conspiracy may be outlined as follows: Large independent bulk blenders entered into long-term exclusive dealings and requirements contracts with Agrico under which a bulk blender would agree to buy all or a very substantial portion of its raw materials from Agrico.[14]

More importantly, these bulk blenders would agree to direct their marketing efforts toward the ultimate consumer. They would cease selling fertilizer raw materials to other wholesalers and finished fertilizers to other retailers or dealers. Thus, sales of both raw materials and finished fertilizers would be allocated to Agrico, and in return Agrico would reduce its retail activities, allocating those sales to the bulk blenders. In some cases Agrico leased its retail outlets to these blenders who entered into executive accounts.

By establishing such agreements, Agrico could reduce the level of competition at the wholesale and dealer levels of distribution, and these bulk blenders could reduce the level of competition in sales to the ultimate consumer. The competition eliminated by these agreements was not only competition in raw materials produced by Agrico or finished fertilizers made from Agrico's products ("intrabrand competition"), but also competition in raw materials produced by Agrico's competitors or in finished fertilizers made from such raw materials ("interbrand competition").[15]

In support of its allegation of conspiracy, Central submitted evidence which suggests that Agrico may have effectuated provisions in the executive account contracts by coercion and threats. There is also some evidence that Agrico responded to complaints lodged by parties to these executive accounts about competitors dealing with Agrico who did not conform their marketing to the terms of the executive account agreement.[16] The Court concludes that Central produced sufficient evidence from which a finder of fact could infer a conspiracy between Agrico and parties to the executive accounts in which the conspirators

---

14. Agrico's contracts provided that Agrico had to meet competitive prices from coproducers, but not from wholesalers such as Central who would resell raw materials. See Exhibit D to Memorandum of Central Chemical Corporation in Opposition to Motion for Summary Judgment on Count IV.

15. There is evidence from which an inference may be drawn that the agreements were also designed to stabilize prices at a higher level in the markets in which Agrico was active.

16. Central argued at the hearing and in its brief on this motion that in return for the blenders' promise to purchase their requirements from Agrico, and further, their promises not to resell raw materials or to market blended materials at the dealer level, Agrico promised not to sell produce to any other prospective purchaser who did not enter the conspiracy. Central argued that this was a uniform policy of Agrico's and that Agrico made each party to an executive account aware of this fact. There is some evidence from which a jury might infer that Agrico communicated to each blender that the above provisions concerning requirements purchasing and marketing limitations were uniform in executive account contracts. There is *no* evidence from which a jury could infer that this condition was imposed by the blenders as the price of their entering the conspiracy. All of the evidence shows that it was Agrico's *unilateral* decision which determined the terms on which its sales were made. *See Hester v. Martindale-Hubbell, Inc.*, 659 F.2d 433, 436 (4 Cir. 1981). Further, it is undisputed that Agrico sold to many purchasers during the shortage who did not enter executive accounts. Brief in Support of Motion for Summary Judgment at 21 n.24. Thus, although the evidence indicates that Agrico would not award an executive account contract unless all of the above conditions were met by the blender, such evidence does not indicate in any way that parties to executive accounts managed to limit Agrico's discretion as to sales to parties not entered into executive accounts. There is, in short, no evidence that the dealers and Agrico had any agreement as to which purchasers Agrico would sell material; rather the evidence indicates that Agrico unilaterally determined the parties to whom it would sell, and the terms on which its product would be sold. The agreement between the dealers and Agrico for which evidence exists relates only to marketing of goods which Agrico did sell.

sought to restrain trade, particularly by means of customer allocation.[17]

 In order to survive defendant's motion, however, plaintiff must do more than establish facts from which the Court infers a conspiracy. Plaintiff must also show that Agrico's refusal to supply Central was *in furtherance of* the illegal conspiracy; that is, plaintiff must demonstrate that Agrico's apparently unilateral refusal to supply was action, in effect, taken in concert with others.

In reaching this interpretation, the Court has examined several decisions in which the Supreme Court has found a conspiracy to violate the Sherman Act. *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). Upon analysis of the facts in each of these cases, the Court consistently finds that a manufacturer is held liable under the antitrust laws when he has acted *in concert with others who are aware that their potentially anticompetitive activity is linked to a specific business deci-*

**17.** It is unclear under what standard a conspiracy such as the one described above should be judged. Although § 1 of the Sherman Act by its terms prohibits all concerted action in restraint of trade, the Act has been construed to prohibit only those contracts, combinations, and conspiracies which unreasonably restrain trade. Although most restraints are judged under "the rule of reason," *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918), some restraints have such a pernicious effect on competition that they are judged to be illegal *per se*. Horizontal market divisions, for example, are illegal *per se*. *United States v. Topco Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). In contrast, the Supreme Court held in *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 58, 97 S.Ct. 2549, 2561, 53 L.Ed.2d 568 (1977), that vertical restraints were generally to be judged under "the rule of reason," overruling the *per se* rule applied to such restraints by the Supreme Court in *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967).

Difficulties arise in choosing the correct standard when a restraint can be characterized as both horizontal and vertical in nature. Thus, Agrico, a manufacturer, distributes its own product *and* employs independent distributors, a marketing scheme which is known as "dual distribution." Agrico, as a manufacturer, imposes certain restraints on its distributors, and those restraints can be viewed as vertical in nature. Agrico also competes with these independent distributors at the wholesale and dealer levels and restraints between competitors are generally viewed as horizontal in nature. The Supreme Court in *Continental* was not faced with such hybrid restraint, although prior to *Continental* such restraints were routinely held to be illegal *per se*. *E.g., American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230 (3 Cir. 1975); *Hobart Bros. Co. v. Malcolm T. Gilliland, Inc.*, 471 F.2d 894 (5 Cir.), *cert. denied*, 412 U.S. 923, 93 S.Ct. 2736, 37 L.Ed.2d 150 (1973).

Since the *Continental* decision, the courts have analyzed the legality of restraints in the dual distributorship context in a variety of ways. *E.g., Donald B. Rice Tire Co. v. Michelin Tire Corp.*, 638 F.2d 15 (4 Cir. 1981) (*per curiam*); *Sherman v. British Leyland Motors, Ltd.*, 601 F.2d 429, 449 (9 Cir. 1979); *Dougherty v. Continental Oil Co.*, 579 F.2d 954, 958–59 (5 Cir. 1978), *vacated and dismissed by stipulation*, 591 F.2d 1206 (5 Cir. 1979); *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126 (2 Cir.) (*en banc*), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978); *H & B Equipment Co. v. International Harvester Co.*, 577 F.2d 239, 245–46 (5 Cir. 1978); *see generally*, S. Altschuler, "*Sylvania*, Vertical Restraints and Dual Distribution," 1980 Antitrust Bulletin 1 (1980). Although the courts initially expended much effort in determining whether such restraints should be characterized as vertical or horizontal, this Court is of the opinion that such a characterization is not particularly useful in a dual distributorship context. Indeed, the Supreme Court recognized that certain vertical restraints might have such a pernicious effect on competition as to justify application of the *per se* rule. *Continental*, 433 U.S. at 58, 97 S.Ct. at 2561. Instead, then, of engaging in a process of mechanical labeling, this Court prefers to scrutinize the effect of restraints on a defendant's *interbrand* (as opposed to intrabrand) competition. If a court would find (1) that the economic effect of an interbrand restraint is similar to that which the courts have condemned as the result of *per se* illegal activity, and if a court would find (2) that an interbrand restraint is a primary necessary, and intended effect of the questioned business practice, then a court should deem the restraint to be *per se* illegal. The Court, however, will not apply this preferred standard to the instant facts because plaintiff fails to show evidence sufficient to link Agrico's refusal to supply Central with a conspiracy to restrain trade between Agrico and parties to the executive account agreements.

*sion* which will affect retailers or wholesalers in general (when the Government sues in a civil suit) or a private plaintiff in particular. In *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), the manufacturer had required drug wholesalers to refuse to deal with retailers who failed to comply with a resale price maintenance plan. In determining that a conspiracy existed between the manufacturer and certain drug retailers, the Supreme Court noted:

> With regard to the retailers' suspension of advertising, Parke Davis did not rest with the simple announcement to the trade of its policy in that regard followed by a refusal to sell to the retailers who would not observe it. First it discussed the subject with Dart Drug. *When Dart indicated willingness to go along the other retailers were approached and Dart's apparent willingness to cooperate was used as the lever to gain their acquiescence in the program.*

362 U.S. at 46, 80 S.Ct. at 513 (emphasis added).

Similarly, in *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), the Supreme Court decided that General Motors was liable under the Sherman Act for prohibiting Chevrolet dealers from participating in business relations with "discount" houses. The facts reveal that specific Chevrolet dealers and several Chevrolet dealer associations actively participated with General Motors in a plan to eliminate the competition by the discount houses. The Supreme Court found that the co-conspirators' intention coincided with specific GM decisions with respect to individual dealers who had had business relations with discount houses: "The [co-conspirator] associations explicitly entered into a joint venture to assist General Motors in policing the dealers' promises, and their joint proffer of aid was accepted and utilized by General Motors." 384 U.S. at 143, 86 S.Ct. at 1329.

Significantly, this Court can read the requirement (that co-conspirators be aware that their participation in a marketing plan is intended to impact on a manufacturer's dealings with non-complying competitors) into *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), an antitrust case involving a private party as plaintiff. In *Albrecht*, a newspaper distributor was terminated for his failure to go along with the manufacturer's pricing policy. The Supreme Court found that the manufacturer had forced two other distributors to put pressure on plaintiff to conform to the pricing policy by soliciting plaintiff's customers. In fact, one of those distributors stood to gain plaintiff's entire route if plaintiff was put out of business. 390 U.S. at 147–48, 88 S.Ct. at 870. In these circumstances, the Supreme Court found a conspiracy between the manufacturer and its dealers to enforce plaintiff's compliance with the anticompetitive practices. It needs to be emphasized that the other distributors in *Albrecht* were fully aware that their activity aided the manufacturer in making anticompetitive decisions with respect to this particular plaintiff. *Id.* Moreover, this interpretation of the *Albrecht* decision is not without precedent. In 1979, the Second Circuit concluded that *Albrecht* mandated a finding of conspiracy "only where there is evidence of knowing and active participation by a dealer and his manufacturer in a scheme to coerce compliance with anticompetitive activity such as resale price maintenance." *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025, 1032 (2 Cir.), *cert. denied*, 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1979). *Cf. Hester v. Martindale-Hubbell, Inc.*, 659 F.2d 433, 436 (4 Cir. 1981) (majority in *Hester* affirming grant of summary judgment based on appellate finding that there was no concerted activity absent evidence of active participation among alleged co-conspirators but expressly declining to rely on the facts in *Albrecht* ).

 Therefore, the Court concludes that co-conspirator awareness of the potential impact of alleged anticompetitive activity on individual competitors must be present if a manufacturer's refusal to deal with respect to a private plaintiff could be

considered action taken *in furtherance of an illegal conspiracy.* Stated more generally, there must be a causal connection between an alleged conspiracy and a refusal to deal which is unilateral but for a link to the alleged conspiracy.[18] *See Hester v. Martindale-Hubbell, Inc.,* 659 F.2d 433 (4 Cir. 1981); *Engine Specialties, Inc. v. Bombardier, Ltd.,* 605 F.2d 1 (1 Cir. 1979), *aff'd on rehearing,* 615 F.2d 575 (1 Cir.), *cert. denied,* 446 U.S. 983, 100 S.Ct. 2964, 64 L.Ed.2d 839 (1980); *Fuchs Sugars & Syrups, Inc. v. Amstar Corp,* 602 F.2d 1025, 1032 (2 Cir.), *cert. denied,* 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1979); *Lee-Moore Oil Co. v. Union Oil Co.,* 599 F.2d 1299, 1301 (4 Cir. 1979); *H & B Equipment Co. v. International Harvester,* 577 F.2d 239 (5 Cir. 1978).[19] In the instant case, Central could have demonstrated a causal connection between the conspiracy and the manufacturer's refusal to deal by proof of joint, collaborative action by the manufacturer and the dealers to eliminate plaintiff, proof that the object of the conspiracy would be frustrated without the termination, or proof of a competitive advantage which the dealers would enjoy if plaintiff were terminated. From such evidence a trier of fact could infer that the refusal to deal with plaintiff was a *result* of the conspiracy. Central has not provided such evidence to the Court.

In fact, plaintiff has shown no evidence of joint, collaborative action between the dealers and Agrico to eliminate Central. The dealers did not supply or buy from Central and did not refuse to deal with Central themselves, facts resembling the situations in *Parke, Davis* and *General Motors.* Nor did Central offer any proof that the dealers attempted to solicit Central's customers, an action which could have put pressure on Central to accede to the conspiracy. *See Albrecht,* 390 U.S. at 147–48, 88 S.Ct. at 870.

Plaintiff has also shown no evidence that the object of the conspiracy between the dealers and Agrico would be frustrated if Central was not terminated. The dealers holding executive account contracts with Agrico were not located in Central's marketing area and did not compete in Central's marketing area.[20] Brief in

**18.** In contesting this motion, Central has chiefly relied upon *Interphoto Corp. v. Minolta Corp.,* 295 F.Supp. 711 (S.D.N.Y.) *aff'd per curiam,* 417 F.2d 621 (2 Cir. 1969). In *Interphoto,* the district court granted a preliminary injunction prohibiting the termination of a distributorship. *Interphoto* is not contrary to the rule applied in the instant case. The district court there stated: "[I]n order for Minolta's termination of Interphoto's distributorship to be unlawful there must be some causal connection between the alleged conspiracy and the refusal to deal." 295 F.Supp. at 721.

**19.** *See also Donald B. Rice Tire Co. v. Michelin Tire Corp.,* 483 F.Supp. 750 (D.Md.1980), *aff'd per curiam,* 638 F.2d 15 (4 Cir. 1981) (termination of distributorship not unilateral act where there was proof of complaints from other dealers about terminated dealers' policies).

**20.** Central belatedly suggested that one executive account might have made sales of unspecified products in Central's marketing area. Reply Memorandum of Central Chemical Corporation in Opposition to Motion for Summary Judgment as to Count IV at 20. The deposition testimony upon which Central relies to make this assertion indicates only that the dealer in question, Hudson, thought it was "possible" that his company had made some sales in

Maryland or Pennsylvania. Hudson Deposition at 42, 50. From such vague and inconclusive testimony the Court cannot draw an inference that competition actually took place between Central and this dealer. For example, even if such sales took place, it is not clear whether the sales were of products which Central marketed. Furthermore, it would be pure speculation to infer that the alleged market allocation scheme between Agrico and Hudson was threatened by any marketing activity by Central contrary to the terms of the conspiracy in what was at best an occasional and infrequent market for Hudson. Therefore, this Court concludes that the testimony concerning Hudson's possible activities in Central's marketing area is insufficient to raise any inference that Hudson conspired with Agrico to cut off supplies to Central.

At oral argument Central also argued that two dealers who had "A-Team" contracts with Agrico were located in Central's marketing area and actually competed with Central. It is undisputed that Agrico did not award any "A-Team" contract, which had terms similar to those of the executive accounts, prior to April 1, 1974, or more than a year after Agrico's refusal to sell supplies to Central. Central argues that, because Agrico sold materials to dealers who were considered potential "A-

Support of Motion for Summary Judgment on Count IV of the Amended Complaint at 13 n.16, 16 n.20, 25 n.28. There is no evidence that Central competed with the parties to executive accounts in any respect.[21] Additionally, Central offers absolutely no evidence to suggest that the executive account dealers were concerned in any way with Central's operations. As Central conceded at oral argument, there is no evidence that any of the executive account dealers complained to Agrico about Central, and thus no inference that Agrico refused to supply Central because of such dealer complaints. *Compare Donald B. Rice Tire Co.*, 483 F.Supp. at 753 *with Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105 (3 Cir. 1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981).

There is also no evidence that the dealers would, by Agrico's refusal to deal with Central, gain any competitive advantage which can be linked to the alleged conspiracy to allocate markets.[22] For example, there is no evidence as there was in *Albrecht*, 390

Term" accounts during FY 1974, and because Agrico's marketing strategy indicated that it would make such sales only to dealers who restricted sales to the ultimate consumer, the dealers who eventually became "A-Team" accounts were co-conspirators. The defect in this argument is Central's failure to supply any evidence to indicate an agreement between these dealers and Agrico. Although it is true that Agrico's marketing policy indicates at least a preference that dealers restrict sales to the ultimate consumer, this is the "mere announcement" of a policy even if it is communicated to a dealer. *See Parke, Davis*, 362 U.S. at 32, 80 S.Ct. at 505. There is no evidence that dealers who entered into A-Team accounts in April, 1974 *agreed* to these terms in order to purchase goods in FY 1974. In contrast, Central has submitted deposition testimony from executive account officials which indicate that agreements took place between those dealers and Agrico. It is undisputed that Agrico sold products during FY 1974 without such conditions. Brief in Support of Motion for Summary Judgment on Count IV of Amended Complaint at 21 n.24. Absent any evidence which suggests an agreement prior to Agrico's refusal to deal with Central between Agrico and any dealers who *later* entered into an A-Team account, the Court must conclude that on the undisputed facts no such agreement or conspiracy existed. *See American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946); *Galloway v. United States*, 319 U.S. 372, 395, 63 S.Ct. 1077, 1089, 87 L.Ed. 1458 (1943). Because there is no evidence to suggest such an agreement, the fact that dealers who *later* entered into A-Team accounts with Agrico competed with Central during FY 1974 is completely irrelevant to Agrico's refusal to deal with Central.

21. It is true that Agrico could not *extend* the conspiracy into Central's area without Central's agreement, but this would not frustrate or even affect the operation of success of the conspiracy which existed between Agrico and the executive account dealers. This factual setting is in marked contrast to that in *Engine Specialties*, 605 F.2d at 12–13, for example, where the evidence indicated that the conspiracy's aim or purpose would be frustrated if the dealer-plaintiff was not terminated. There is no evidence to suggest that the conspiracy between the dealers and Agrico would be affected by Central's refusal to accede to the conspiracy's aims, and therefore no possible inference that Agrico's refusal to deal was in furtherance of that conspiracy.

22. It is noteworthy that the only conspiracy for which Central offers any evidence is an agreement between Agrico and the executive account dealers to allocate customers. Under Central's version of this conspiracy, a wholesaler such as Central would obtain product from Agrico, regardless of the shortage, if the wholesaler would agree to the terms of the conspiracy.

Although Central argues that the dealers would have gained a competitive advantage by Agrico's refusal to sell scarce materials to Central, it is clear that this advantage has no connection to the conspiracy between Agrico and the dealers to allocate markets. That is, if Central had agreed to that conspiracy, Central would have received product despite any corresponding lessening in the product available to the dealers. The dealers might have been advantaged by Agrico's eventual refusal to deal with Central. Central, however, offers no evidence to indicate that the dealers *asked* Agrico to terminate supplies to Central. There is, in fact, no evidence that any of the dealers in question said *anything* to Agrico concerning Central's purchase of product or its operations in general. Central raised this argument concerning the dealers' advantage at oral argument on this motion. Significantly, after six years of discovery, Central is able to offer no evidence to support an inference that the dealers conspired with Agrico to eliminate Central or to cut off supplies to Central, whether because of the shortage or for any other reason. *See, e.g., Edward J. Sweeney*, 637 F.2d at 111–112; *Aviation Specialties, Inc. v. United Technologies Corp.*, 568 F.2d 1186, 1192 (5 Cir. 1978).

U.S. at 147–48, 88 S.Ct. at 870, to indicate that any of the dealers stood to gain any of Central's customers if Agrico refused to supply Central. Indeed, because the executive account dealers were not affected by Central's operations, and did not market in any regular way in Central's marketing area, one would not ordinarily expect to find any competitive advantage accruing to them as a result of Agrico's refusal to supply Central with raw materials. This is particularly true with respect to any advantage relating to an agreement between Agrico and the dealers to allocate customers in their separate markets. The simple fact is that the dealers did not compete for markets with Central.

 Thus, the Court concludes that Central has failed to produce any evidence to indicate that Agrico's refusal to supply Central with raw materials was in furtherance of any conspiracy with the dealers. The Court must conclude from the undisputed facts that the refusal to supply was a unilateral act by Agrico, and a unilateral refusal to deal does not state a claim under the antitrust laws. *United States v. Colgate Co.*, 250 U.S. at 307, 39 S.Ct. at 468; *Sierra Wine & Liquor Co. v. Heublein, Inc.*, 626 F.2d 129, 132–33 (9 Cir. 1980); *H & B Equipment*, 577 F.2d at 245; *Osborn v. Sinclair Refining Co.*, 286 F.2d 832, 836 (4 Cir. 1960), *cert. denied*, 366 U.S. 963, 81 S.Ct. 1942, 6 L.Ed.2d 1255 (1961). Therefore, the Court concludes that Agrico is entitled to judgment on this claim as a matter of law.

### Monopolization Claims

 Central argues that Agrico is liable for the completed act of monopolization and the inchoate offense of attempted monopolization, both of which are proscribed by Section 2 of the Sherman Act.[23] The two elements constituting the Section 2 offense of monopoly are "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power [i.e., intent to monopo-

lize] as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). "Monopoly power" is defined as the "power to control prices or exclude competition." *United States v. E. I. DuPont deNemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956) (the Cellophane Case). A "relevant market" is "composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use, and qualities considered." 351 U.S. at 404, 76 S.Ct. at 1012. Stated otherwise, a relevant market is one in which a product effectively competes with functionally equivalent products. *See Sargent-Welch Scientific Co. v. Ventron Corp.*, 567 F.2d 701, 710 (7 Cir. 1977), *cert. denied*, 439 U.S. 822, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978).

### A. Executed Monopolization: The Shortage Theory

Central presses what is popularly known as the shortage theory to buttress its claim that Agrico is liable for monopolization. Under this theory, plaintiff essentially claims that the defendant illegally monopolized its scarce sources of DAP and GTSP by refusing to supply these raw materials to Central during the shortage year of FY 1974.

 The plaintiff advances the shortage theory in preference to the generally accepted monopolization theory which condemns a defendant for using its power at one level of production (e.g., manufacturing) or in one market to drive out competition in another (e.g., at the wholesale level or in a different market). *Poster Exchange, Inc. v. National Screen Service Corp.*, 431 F.2d 334, 339 (5 Cir. 1970), *cert. denied*, 401 U.S. 912, 91 S.Ct. 880, 27 L.Ed.2d 811 (1971). *Cf. Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 375, 47 S.Ct. 400, 404, 71 L.Ed. 684

---

**23.** In relevant part, § 2 provides that "[e]very person who shall monopolize, or attempt to monopolize . . . any part of the trade or com-

merce . . . shall be deemed guilty of a misdemeanor." 15 U.S.C. § 2.

(1927) (evidence that defendant knew of plaintiff's contract—most likely for different goods—with competitor-manufacturer when defendant refused to supply plaintiff was sufficient to raise inference that the refusal was made in pursuance of monopolization; as such, this was an issue which could be submitted to the jury) (case cited with approval in *Otter Tail Power Co. v. United States*, 410 U.S. 366, 377, 93 S.Ct. 1022, 1029, 35 L.Ed.2d 359 (1973)).

The plaintiff advances this shortage theory presumably because the plaintiff acknowledges that the defendant did not have an absolute monopoly on the total available supply of DAP and GTSP in FY 1974. Hence, the prominent feature of plaintiff's theory is that absolute monopolization of a level of production or in a market is unnecessary. Plaintiff contends that by virtue of the shortage, each producer becomes a monopolist as to its own sources of the scarce materials, and has a corresponding responsibility to supply its competitors at the wholesale and retail level with adequate amounts of the product. According to plaintiff's view, each producer's own supply would become the relevant market because during a shortage, each manufacturer's product would be effectively immune from competition.

■ Central is correct in contending that it would be possible to prove a relevant market in one manufacturer's product. As one district court stated:

> [A] relevant submarket in one's own products will exist if such a submarket is (a) sufficiently distinct in commercial reality, and (b) is relatively immune from competition of substitutes, or (c) was acquired by means that show an attempt to monopolize.

*United States v. CBS, Inc.*, 459 F.Supp. 832, 838 (C.D.Cal.1978). The difficulty in plaintiff's argument is that the issue of what constitutes a product immune from competition is not clearcut.

In *Mullis v. ARCO Petroleum Corp.*, 502 F.2d 290 (7 Cir. 1974), a gasoline distributor argued that the gasoline producer had the duty to supply gas under a reasonable allocation system and could not terminate a distributorship during a shortage. The producer operated some service stations at the retail level, and therefore was a competitor of plaintiff's on that level. *Id.* at 294. Thus, if the plaintiff was correct in its characterization of the producer as a monopolist in its scarce product, the producer would have had a duty to deal with the distributor.

■ Judge Stevens, then of the Seventh Circuit, rejected plaintiff's argument that during a shortage each producer becomes a monopolist as to its product, stating:

> [T]he various brands of gasoline would retain the physical characteristics that make them readily interchangeable for essentially the same uses. Indeed, such factors as advertising of particular brands, which tend to differentiate otherwise similar products, become less significant in time of shortage. Whether viewed from the standpoint of the ultimate consumer, or of a distributor such as plaintiff, it would be less important to obtain a particular kind of gasoline than to purchase any gasoline at all. The so-called "cross-elasticity of demand" would tend to enlarge the relevant product market as the competition among buyers of petroleum. [sic] [increased].

*Id.* at 298. Judge Stevens addressed plaintiff's arguments that the other suppliers did not provide him with an alternative source of supply:

> It is entirely possible that all 20 of ARCO's competitors had valid reasons, unrelated to any shortage, for not wishing to establish business relations with plaintiff. If that should not be true, no reason is apparent from the record why he was not free to offer to pay a higher price, or to perform superior services, than existing distributors of competing brands of gasoline, and thereby secure product from one of ARCO's competitors. . . . The fact that in such a market plaintiff might have to offer an unusually high price, or unusually favorable terms, in order to obtain a new source of supply, is not a reason for redefining the market

to include less than all of the firms competing within it.

*Id.* at 297. Finally, Judge Stevens stated:

The fact that an injury to a particular competitor may be unusually severe is not a justification for adopting a market definition which only considers the particular product line which he has previously sold or purchased. For in Sherman Act litigation we must adhere to the admonition that the statute is concerned "with the protection of *competition*, not *competitors*." And whether the competition is more intense on the seller's or the buyer's side of the market, we may not arbitrarily segregate one brand from equally acceptable substitutes in order to protect a particular competitor from injury.

*Id.* at 298–99 (footnote omitted) (emphasis in original).

This Court finds the reasoning employed by Judge Stevens in *Mullis* to be persuasive in the instant case. Plaintiff was not foreclosed from seeking product from other producers. If those other producers had legitimate business reasons for not supplying plaintiff with material to replace that which Agrico did not supply, the Court is at a loss to understand why Agrico should be held responsible for those producers' independent exercise of business judgment. There is no reason to believe that the other producers would have been oblivious to an offer for scarce materials which was significantly more attractive than that of its regular customers. The other producers must, therefore, be considered as potential competitors for plaintiff's business, and Agrico's supply of DAP and GTSP was not immune from that competition.[24]

In an analogous case involving an allegation of attempted monopolization, the Fourth Circuit indicated that it might well be critical of the shortage monopoly theory. *White Bag Co. v. International Paper Co.*, 579 F.2d 1384 (4 Cir. 1974). In *White Bag*, the defendant produced multiwall paper and also manufactured multiwall paper bags, for which the multiwall paper was a necessary component. The plaintiff manufactured multiwall paper bags and therefore competed with the defendant. The defendant was also the plaintiff's primary source for the necessary multiwall paper. A shortage developed in the supply of unprocessed paper, and during the shortage the defendant could not supply all of its eleven customers with ordinary quantities of the processed paper. Defendant reviewed its contractual relations with all eleven customers and decided not to renew its contract with plaintiff, among others, although it did supply plaintiff with some paper. On these facts the district court granted a preliminary injunction. The Fourth Circuit reversed, stating:

Because of the supply and demand situation, it [defendant] could not serve the needs of all eleven of its prior customers to the extent it previously had done, and its decision to serve the increasing needs of some, rather then restricting deliveries to all, had been recognized as a legitimate business decision. *In any event, this kind of selectivity among customers, who are also competitors in the bag manufacturing business, arising out of exigent circumstances, does not support a finding of attempted monopolization,* when International [defendant] was a producer of only a small proportion of multiwall paper and did nothing to increase its proportion of the multiwall bag market.

---

24. At oral argument, counsel for plaintiff conceded that Central purchased raw materials from two other producers following Agrico's refusal to supply. Central argued that this was not significant to a consideration of Agrico's position as a monopolist, because Central had to give up a portion of its supply of scarce potash in return for scarce granulated goods, presumably DAP and GTSP. The Court is of the opinion that this transaction demonstrates precisely the point of the *Mullis* court; Agrico's supply of product was not immune from competition and, even during the shortage, Central had alternative sources. The fact that Central gave up an equally scarce commodity to obtain such product is consistent with the high demand and low supply of a shortage situation. The Court is not sympathetic to plaintiff's argument that a supplier need provide his regular customers at regular prices during a shortage situation in order to avoid a violation of § 2 of the Sherman Act.

*Id.* at 1386 (emphasis added). It is certainly nowhere suggested in *White Bag* that a manufacturer during a shortage becomes a monopolist as to its supply of its product. Furthermore, many courts which have considered the shortage monopoly theory have rejected it. *Bushie v. Stenocord Corp.*, 460 F.2d 116 (9 Cir. 1972); *Nebraska-Iowa Car Wash, Inc. v. Mobil Oil Corp.*, 1976–1 Trade Cas. ¶ 60,849 (N.D.Iowa 1976); *Thomas v. Amerada Hess Corp.*, 393 F.Supp. 58, 73 (M.D.Pa.1975); *see also Neugebauer v. A. S. Abell Co.*, 474 F.Supp. 1053, 1064 (D.Md. 1979).

Plaintiff's reliance on *Gamco, Inc. v. Providence Fruit & Produce Building, Inc.*, 194 F.2d 484 (1 Cir.), *cert. denied*, 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 636 (1952) and *American Federation of Tobacco Growers, Inc. v. Neal*, 183 F.2d 869 (4 Cir. 1950) is misplaced. These cases involve the so-called "bottleneck" phenomenon, where a natural monopoly results from the fact that only one facility can economically serve a particular market function. In such a case, the person in charge of the facility possesses control over a unique commodity, *e.g.*, in *Gamco*, selling sites and in *Neal*, selling time, and courts have consistently held that the monopolist must use reasonable selection criteria in allocating the unique commodity. Although these cases discuss the alternatives available to a person seeking access to the facility, the courts make clear the fact that in order to compete *effectively*, competitors must have access to the facility, hence the term "bottleneck," and the corresponding imposition of the monopolist's duty to deal. This situation is distinguishable from the case at bar, where many suppliers produce functionally interchangeable DAP and GTSP. In fact, in this case Central had used several suppliers other than Agrico for these scarce products. Agrico was not in control of a unique facility, but rather was a supplier of a common product, albeit during a shortage.

This Court concludes that despite the shortage, Agrico's supply of DAP and

GTSP was not immune from competition. Consequently, the Court must find that Agrico was not a monopolist and had no duty to deal with Central.

**B. *Attempted Monopolization***

█ Central also argues that Agrico attempted to monopolize certain markets in violation of Section 2 of the Sherman Act. To prevail on an attempted monopolization claim, the Supreme Court has stated that a plaintiff must show specific intent to monopolize and a dangerous probability that the attempted monopoly will be successful. *American Tobacco Co. v. United States*, 328 U.S. 781, 785, 814–15, 66 S.Ct. 1125, 1127, 1141–42, 90 L.Ed. 1575 (1946). Agrico, while not conceding that any proof of specific intent exists, argues that Central has insufficient evidence as a matter of law to establish any dangerous probability of Agrico's success in monopolizing any market, and that Agrico is therefore entitled to judgment on this claim.

Plaintiff originally charged that Agrico was engaged in an attempt to monopolize the wholesale and retail markets for DAP and GTSP in the eastern United States. Plaintiff produced no evidence as to defendant's strength in the retail market. Furthermore, Agrico produced a sworn affidavit indicating that barriers to entry in the retail, or blended fertilizer, market were low. Agrico also offered some evidence to indicate that its market share was less than 10% in this market. Recognizing the lack of evidence to support a claim of attempted monopolization in the *retail* market, Central withdrew this claim at the hearing on this motion.[25]

Central also complained that Agrico was attempting to monopolize the *wholesale* market for DAP and GTSP in the eastern United States, presumably by its program of internal expansion of its production capacity in those products. In order to decide whether Agrico was dangerously close to

---

**25.** The withdrawal of this claim is particularly significant. Initially, Central's major complaint concerned Agrico's attempts to enlarge its share of the *retail* market during the shortage through the executive account contracts. *See White Bag*, 579 F.2d at 1386–87.

succeeding in a monopolization of the wholesale market of DAP and GTSP during FY 1974, the Court must decide which percentage of ownership in the relevant product market would constitute a monopoly in the circumstances.

 Two disputes, however, arose over the definition of the relevant product market. One dispute concerned whether Central's method of separating out figures measuring production and capacity to produce DAP and GTSP from government statistics measuring production of ammonium phosphates (AP) and triple superphosphates (TSP) was reliable. Agrico also contested Central's definition of the relevant product market to the extent that Central excluded DAP or GTSP held or produced by agricultural cooperatives.[26] The parties presented conflicting evidence on the issues.

The Court concludes that it need not resolve these issues regarding the definition of the relevant product market. The Court will assume for purposes of this claim that Central's definition of the relevant product market is correct.

 In its brief, Central presents the following description of Agrico's market shares in the market for AP and DAP:

[I]n fertilizer year 1971/72 Agrico possessed 18% of the ammonium phosphate capacity but it had three rivals whose percentage of capacity was [sic] respectively 13.9%, 11.6% and 10.7%. In the ensuing six years Agrico's capacity touched a high of 26.5% in fertilizer year 1974/75 and was 23.7% in fertilizer year 1976/77. Of even more significance is that contrary to the situation in fertilizer year 1971/72, in fertilizer year 1976/77 Agrico's own capacity was virtually as large as the capacity of the next three largest competitors. In other words,

---

**26.** The Court is of the opinion that production of DAP and GTSP by cooperatives might well be excluded from the relevant market. The Court does not agree with the defendant that the allegation by Central that independent wholesalers had no access to the farmer cooperatives' product is legally irrelevant.

The primary concern in defining a submarket is whether domination of the product market would enable a defendant to control prices and exclude competition. *ILC Peripherals Leasing Corp. v. International Business Machines Corp.*, 458 F.Supp. 423 (N.D.Calif.1978), *aff'd sub nom., Memorex Corp. v. International Business Machines Corp.*, 636 F.2d 1188 (9 Cir. 1980), *cert. denied*, 452 U.S. 972, 101 S.Ct. 3126, 69 L.Ed.2d 983 (1981). It is not the perception of manufacturers but those of the consumers which are most salient in a determination of market boundaries. *Columbia Metal Culvert Co. v. Kaiser Aluminum & Chemical Corp.*, 579 F.2d 20, 28 (3 Cir.), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978). The Seventh Circuit recently explained that the goal in ascertaining a relevant market is to "delineate markets which conform to areas of effective competition and to the realities of competitive practice." *Sargent-Welch Scientific Co. v. Ventron Corp.*, 567 F.2d 701, 710 (7 Cir. 1977), *cert. denied*, 439 U.S. 822, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978). Moreover, the Third Circuit explained:

[D]efining a relevant product market is a process of describing those groups of producers which, because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other. A market definition must look at all relevant sources of supply, either actual rivals or eager potential entrants to the market.

*Smith-Kline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063 (3 Cir.), *cert. denied*, 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978).

Agrico argues that one must focus on the ultimate consumer in defining a product market. This is not, however, the market in which Central alleges that Agrico is attempting to monopolize. Rather, Central argues that Agrico is attempting to monopolize the market supplying DAP and GTSP to independent wholesalers. If independent wholesalers cannot purchase such materials from cooperatives, then the cooperatives would not in fact effectively compete in that market. Thus, if Agrico were the only non-cooperative producer, and sought to control prices and exclude competition in the wholesale market, the fact that the cooperatives also produced such materials would not prevent Agrico from taking such action, if *in fact* the cooperatives could not sell to the independent wholesalers. *See Otter Tail*, 410 U.S. at 369–70 nn. 1, 3, 93 S.Ct. 1025–26 nn. 1, 3. Because Agrico could, under certain facts, exercise monopoly power in the wholesale market, the Court does not find Central's contentions as to wholesalers' lack of access to cooperatives' products to be legally irrelevant. A factual issue is presented, however, as to whether the cooperatives are in any manner barred from selling product to independent wholesalers.

there was a trend toward single firm domination.

. . . . .

Agrico's production of DAP produces a similar market share. Based on Agrico's reports in its own 10–K forms and government statistics as to the production of diammonium phosphate in this country, Agrico's production of DAP in calendar year 1974 equalled 22.9% of the total noncooperative Eastern production and grew to 26.4% in calendar year 1975 and further grew to 26.9% in calendar year 1976. (Exhibit Y hereto) [footnote omitted].

Memorandum in Opposition at 48–49.[27] Central's description of Agrico's market share for TP and GTSP states:

Adjusting the capacity figures [given by Agrico's affiant, Dr. Bodoff] to reflect the fact that cooperatives do not participate in this market results in Agrico possessing 11.7% of capacity in fertilizer year 1971/72 which grew to 18.2% of capacity in fertilizer year 1974/75 prior to declining to 15.8% in fertilizer year 1976/77. (Exhibit Z hereto). Making similar adjustments on production figures results in Agrico possessing a market share ·as high as 23.4% in fertilizer year 1972/73 and as low as 13.2% in fertilizer year 1976/77.

*Id.* at 50.

Central offers no evidence to dispute the statements by defendant's affiant, Dr. Joan Bodoff, and a former member of Central's Board of Directors, Mr. William Rohrer, that competition in the relevant markets is keen, and that neither price leadership nor other evidence of incipient market dominance by Agrico can be observed. Nor does Central offer evidence to dispute the affiant's opinion and Mr. William Rohrer's testimony that the capital costs involved in constructing additional capacity to produce DAP or GTSP are so enormous that any attempt to monopolize these markets would be prohibitively expensive and beyond Agrico's financial resources.

Moreover, in GTSP production Agrico's market share declined from 1974/75 to 1976/77. While Agrico's market share of DAP increased from calendar year 1974 to 1976, by Central's calculations the increase was 4% over two years, and only .5% in one of those years. Central does not dispute that this increase can be attributed to a new facility for the production of DAP which was brought on line in FY 1975, a year after Central was allegedly harmed by Agrico's actions in the market. There is no evidence to indicate that Agrico's market share increased dramatically over the period from 1971/72 to 1976/77.

On the evidence presented, there is no indication that Agrico is in a position from which it is dangerously probable that it will achieve monopoly power in the non-cooperative wholesale market for DAP and GTSP in the Eastern United States. The cases on which plaintiff relies present markedly different facts. In *Outboard Marine Corp. v. Pezetel*, 461 F.Supp. 384, 404 (D.Del.1978), defendant's share of the electric golf cart market had grown from zero to 35% in a few short years, a situation in glaring contrast to Agrico's increase of 4% of the DAP market over two years.

In *Lektro-Vend Corp. v. Vendo Co.*, 403 F.Supp. 527 (N.D.Ill.1975), *aff'd*, 545 F.2d 1050 (7 Cir. 1976), *rev'd on other grounds*, 433 U.S. 623, 97 S.Ct. 2881, 53 L.Ed.2d 1009 (1977), the district court awarded preliminary injunctive relief against enforcement of a non-competition covenant in an em-

---

**27.** Central also presents an "adjustment" of these figures based on its assumption that cooperatives were producing DAP at a higher capacity than non-cooperatives, and that their proportionate share of the total DAP market was higher than the government figures indicated, which would mean that the non-cooperative market for DAP was smaller than the figures indicated. On this assumption Central increased Agrico's share to reflect its position in the alleged smaller market. *Id.* at 49–50. The factual assumption on which this adjustment is made is faulty. Reply Memorandum of Agrico at 16 n.17. Even assuming that the assumption is correct, the actual mathematical manipulation of the figures at issue is not explained. The Court, therefore, will not consider these figures, although it is of the opinion that they would not compel a different result.

ployment contract, noting that enforcement of the covenant where defendant had 20% of the market might create a dangerous probability of monopolization. When the case came before the district court on the merits, 500 F.Supp. 332 (N.D.Ill.1980), the evidence demonstrated that defendant's market share had varied from 33% to 24% between 1966–73. The district court entered judgment for defendant on the attempted monopolization claim, stating "plaintiffs do not offer one case in which a finding of an attempt to monopolize was based on a market share of the size attributed to [defendant]—even apart from the fact that [defendant's] share has been *declining*." *Lektro-Vend Corp. v. Vendo Co.*, 500 F.Supp. 332, 356 (N.D.Ill.1980) (emphasis in original), *aff'd*, 660 F.2d 255 (7 Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982).[28]

Given the size of the market shares alleged in this case and their fluctuation over a several-year period in a highly competitive industry which has many existing competitors and high barriers to internal expansion, the Court must conclude that the evidence of market share and market structure is insufficient as a matter of law to establish Central's attempted monopolization claim.[29] *See Yoder Bros., Inc. v. California-Florida Plant Corp.*, 537 F.2d 1347, 1368–69 (5 Cir. 1976), *cert. denied*, 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977); *Hiland Dairy, Inc. v. Kroger Co.*, 402 F.2d 968, 975–76 (8 Cir. 1968), *cert. denied*, 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748 (1961);

*Mowery v. Standard Oil Co.*, 463 F.Supp. 762, 773 n.14 (N.D.Ohio 1976), *aff'd without opinion*, 590 F.2d 335 (6 Cir. 1978). *See also Harold Friedman, Inc. v. Kroger Co.*, 581 F.2d 1068 (3 Cir. 1978). Thus, the Court concludes that Central has failed to establish any dangerous probability of Agrico's success in monopolizing any relevant market. Accordingly, Agrico's motion for summary judgment will be granted on this claim as well.

---

**28.** Likewise, Central's reliance on *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*, 452 F.2d 579 (7 Cir. 1971), *cert. denied*, 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972) is misplaced. In *Kearney*, the defendant used a fraudulently obtained patent as leverage in attempting to acquire monopoly power in the multifunction machine tool industry. *Id.* at 599–600.

**29.** Central argues that Agrico's position as a basic producer of phosphate rock, phosphoric acid, anhydrous ammonia and urea, along with Agrico's ability to "extract" long-term requirements contracts from its customers, are factors which indicate that Agrico's market share understates its actual market power. Certainly

the fact that Agrico offers long-term requirements contracts with terms beyond a projected shortage does not by itself indicate that Agrico has monopoly power; there is no evidence to suggest that other producers did not employ such long-term contracts. Undisputed evidence indicates that at least one other domestic producer had a large mining capacity, *see* Memorandum in Opposition at 53, and that Agrico produces only 5% to 7% of the phosphoric acid in the Eastern United States. Bodoff Affidavit at 9. Correspondingly, there is no evidence to support Central's assertions as to the effect of Agrico's mining capacity on its market position.